IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA | ) | |
|   and | ) | |
| LOUISIANA DEPARTMENT OF | ) | |
| ENVIRONMENTAL QUALITY, | ) | |
| | ) | No. 2:15-cv-04889-CJB-KWR |
| Plaintiffs, | ) | |
| v. | ) | Section "J", Division 4 |
| | ) | |
| MOSAIC FERTILIZER, LLC, | ) | Honorable Carl Barbier |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

CONSENT DECREE

**Mosaic Consent Decree – EPA Region 6 and LDEQ**

TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | JURISDICTION AND VENUE | 5 |
| II. | APPLICABILITY | 6 |
| III. | DEFINITIONS | 8 |
| IV. | CIVIL PENALTY | 18 |
| V. | COMPLIANCE REQUIREMENTS | 19 |
| VI. | WORK TAKEOVER | 42 |
| VII. | BENEFICIAL ENVIRONMENTAL PROJECTS | 45 |
| VIII. | REPORTING REQUIREMENTS | 47 |
| IX. | STIPULATED PENALTIES | 51 |
| X. | FORCE MAJEURE | 54 |
| XI. | DISPUTE RESOLUTION | 57 |
| XII. | INFORMATION COLLECTION AND RETENTION | 60 |
| XIII. | EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS | 63 |
| XIV. | COSTS | 66 |
| XV. | NOTICES | 69 |
| XVI. | EFFECTIVE DATE | 71 |
| XVII. | RETENTION OF JURISDICTION | 72 |
| XVIII. | MODIFICATION | 72 |
| XIX. | TERMINATION | 73 |
| XX. | PUBLIC PARTICIPATION | 76 |
| XXI. | SIGNATORIES/SERVICE | 77 |
| XXII. | INTEGRATION | 78 |
| XXIII. | FINAL JUDGMENT | 78 |
| XXIV. | APPENDICES | 79 |

## CONSENT DECREE

**WHEREAS**, Plaintiffs, the United States of America (United States), on behalf of the United States Environmental Protection Agency (EPA), and the Louisiana Department of Environmental Quality (LDEQ), an agency of the State of Louisiana to which the Louisiana Legislature has delegated the power and duty to enforce the Louisiana Environmental Quality Act (EQA) and Louisiana Environmental Quality Regulations, including the authority to bring actions in courts of competent jurisdiction for violations of the EQA (La. R.S. 30:2001 et seq.) and Louisiana's Hazardous Waste Regulations (LAC 33: V. Subpart 1), (together the Plaintiffs), have filed a complaint alleging that Defendant, Mosaic Fertilizer, LLC (Mosaic) has violated the Resource Conservation and Recovery Act (RCRA), 42 United States Code (U.S.C.) § 6901 et seq., La. R.S. 30:2001 et seq., and the applicable regulations in 40 C.F.R. Parts 260-270, and LAC 33:V.Subpart 1, at its sulfuric acid, phosphoric acid and fertilizer manufacturing facilities located in Uncle Sam and Saint James, Louisiana, respectively the Uncle Sam Facility and the Faustina Facility (collectively the Facilities);

**WHEREAS**, the Complaint includes allegations that Mosaic failed to characterize and illegally treated, stored and disposed of hazardous waste from various processes at its Facilities, including: the production of sulfuric acid, diammonium phosphate (DAP) and monoammonium phosphate (MAP) fertilizer, and fluorosilicic acid (FSA); wastes generated during cleaning of the phosphoric acid plant and fertilizer plant equipment; and wastewaters generated from the scrubbers used to control air pollution from the phosphoric acid plants and from other chemical and waste management processes at its Facilities without a RCRA permit or interim status. The Complaint also alleges that Mosaic illegally placed hazardous wastes in the Uncle Sam Phosphogypsum Stack System dedicated for managing phosphoric acid production wastes

exempt from hazardous waste regulation pursuant to the Bevill Exemption, 40 C.F.R.

§ 261.4(b)(7), thus violating Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924-25, and the

applicable regulations in 40 C.F.R. Parts 260-270, and La. R.S. 30:2001 et seq. and the

applicable regulations in LAC 33:V.Subpart 1, and that those hazardous wastes remain in the

Uncle Sam Phosphogypsum Stack System;

WHEREAS, Mosaic denies the applicability of Sections 3004 and 3005 of RCRA,

42 U.S.C. §§ 6924-25, and the applicable regulations in 40 C.F.R. Parts 260-270, and La. R.S.

30:2001 et seq. and the applicable regulations in LAC 33:V.Subpart 1, and the regulations

promulgated thereunder to certain practices at the Mosaic Facilities that are the subject of the

Complaint, denies the violations alleged in the Complaint, and maintains that it has been and

remains in compliance with RCRA and is not liable for civil penalties or injunctive relief;

WHEREAS, the objective of the Parties in this Consent Decree is to resolve the civil

claims alleged in the Complaint by 1) establishing certain injunctive relief and environmental

projects, whereby Mosaic shall modify certain operating practices with respect to its

management of hazardous wastes and Bevill-Exempt Wastes, implement environmental controls,

remediation, and financial assurance, and undertake certain pollution reduction and other

beneficial projects; and 2) assessing an appropriate penalty;

WHEREAS, Mosaic has conducted itself in good faith in its discussions with the

Plaintiffs concerning the violations alleged in the Complaint, and has already implemented

certain operational changes at its Facilities and remedial  measures, obviating the need for certain

injunctive relief;

WHEREAS, by agreeing to entry of this Consent Decree, Mosaic makes no admission

of law or fact with respect to the allegations in the Complaint, and continues to deny any non-

compliance or violation of any law or regulation identified therein or in this Consent Decree. For the purpose of avoiding litigation among the Parties, however, Mosaic, and where applicable The Mosaic Company, agree to the requirements of this Consent Decree;

**WHEREAS**, the Parties agree that the United States' filing of the Complaint and entry into this Consent Decree constitutes diligent prosecution by the United States and LDEQ, under Section 7002(b)(1)(B) of RCRA, 42 U.S.C. § 6972(b)(1)(B), of all matters alleged in the Complaint and addressed by this Consent Decree through the date of lodging of this Consent Decree; and

**WHEREAS**, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

**NOW, THEREFORE**, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), below, and with the consent of the Parties,

**IT IS HEREBY ADJUDGED, ORDERED, AND DECREED** as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action and over the Parties, pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), and 28 U.S.C. §§ 1331, 1332, 1345, 1355 and 1367.  Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a), and Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), because Mosaic's Facilities are located in this judicial district.  For purposes of this Consent Decree, or any action to enforce this Consent Decree, the Parties consent to the Court's jurisdiction over this

Consent Decree and any such action and over Mosaic and The Mosaic Company, and further consent to venue in this judicial district.

2.      Pursuant to Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2), notice of the commencement of this action has been given to LDEQ.

3.      For purposes of this Consent Decree only, Mosaic agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 3004 and 3005 of RCRA, 42 U.S.C. §§ 6924 and 6925, and La. R.S. 30:2001 et seq.

## II.  APPLICABILITY

4.      The obligations of this Consent Decree apply to and are binding upon the United States, LDEQ, Mosaic, and, as provided herein. The Mosaic Company, and any successors, assigns, or other entities or persons otherwise bound by law.  Rights granted to EPA under this Consent Decree may be exercised by LDEQ upon the written agreement of EPA and LDEQ with notice to Mosaic.  Nothing in this Consent Decree shall apply to administrative or enforcement proceedings other than this action or an action to enforce this Consent Decree.  Nor does anything in this Consent Decree relieve Mosaic of its obligation to comply with any federal and state laws applicable to activities that are not within the definition of Work in this Consent Decree.

5.      No transfer of ownership or operation of all or a portion of a Facility subject to the obligations of the Consent Decree, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Mosaic of its obligation to ensure that the terms of this Consent Decree are implemented, unless:  (1) the transferee agrees in writing to undertake the obligations required by this Consent Decree and to be substituted for Mosaic as a Party to the Consent Decree and thus be bound by the terms thereof; and (2) the United States, after consultation with LDEQ, consents in writing to relieve Mosaic and the Mosaic Company of

their respective obligations under this Consent Decree pursuant to Section XVIII (Modification) of this Consent Decree.  At least thirty (30) Days prior to a proposed transfer of any or all of Mosaic's obligations under this Consent Decree, or such other period agreed to by the Parties in writing: (i) Mosaic shall provide a copy of this Consent Decree to the proposed transferee, if not previously provided; and (ii) shall provide written notice of the prospective transfer, together with a copy of the proposed written agreement (subject to Paragraphs 82 and 83 of this Consent Decree and as may otherwise be agreed in writing) transferring obligations to the transferee, to EPA, LDEQ, the United States Attorney for the Eastern District of Louisiana, and the United States Department of Justice, in accordance with Section XV (Notices) of this Consent Decree, together with a request for approval.  The United States' decision whether to approve the transferee's substitution for Mosaic under this Consent Decree, and what conditions may attend approval, will take into account:  (i) the status of the projects in Appendix 6 (RCRA Compliance Schedule), (ii) whether the transferee has or will have prior to the transfer the financial and technical capability to comply with this Consent Decree, (iii) and other factors that may be deemed relevant, including but not limited to the environmental compliance history of the proposed transferee and the environmental management capabilities of the proposed transferee. As set forth in Appendix 2, Paragraph 36, any such transfer will not include the Financial Assurance obligations specified for Mosaic therein, and therefore will include Financial Assurance conditions appropriate to the transferee.  Any transfer of ownership or operation of all or a portion of the Facilities without complying with this Paragraph constitutes a violation of this Consent Decree.  The United States' refusal to approve, or approval with conditions for, the substitution of the transferee for Mosaic under this Consent Decree shall be subject to dispute resolution pursuant to Section XI (Dispute Resolution) of this Consent Decree, but any judicial

review shall be conducted pursuant to Paragraph 76(a) of this Consent Decree.  If Mosaic does

not prevail in such judicial review, Mosaic shall pay all costs incurred by the United States in

connection with such judicial review, including attorneys' fees.

6.      Mosaic shall: (1) provide a copy of this Consent Decree to its President/CEO,

Executive Vice Presidents, Senior Environmental Counsel, and the General Manager,

Environmental Manager, and Maintenance Manager of each Facility, and shall ensure that any

employees and contractors whose duties might reasonably include compliance with any

provision of this Consent Decree are made aware of this Consent Decree and specifically aware

of the requirements of this Consent Decree that fall within such person's duties; (2) place an

electronic version of the Consent Decree on its internal environmental website; and (3) post

notice of lodging of the Consent Decree and its availability in a location at each Facility where

legal notices are posted.  Mosaic shall be responsible for ensuring that all employees and

contractors involved in performing any Work pursuant to this Consent Decree perform such

Work in compliance with the requirements of this Consent Decree.

7.      In any action to enforce this Consent Decree, Mosaic shall not raise as a defense

the failure by any of its officers, directors, employees, agents, or contractors to take any actions

necessary to comply with the provisions of this Consent Decree.

## III.  DEFINITIONS

8.      Every term expressly defined by this Section shall have the meaning given that

term herein, regardless of whether it is elsewhere defined in federal or state law.  Every other

term used in this Consent Decree that is also a term used under RCRA, as amended, 42 U.S.C.

§§ 6901 et seq., its implementing regulations, or La. R.S. 30:2001 et seq. and its implementing

regulations, shall have the same meaning in this Consent Decree as such term has under RCRA

or under federal or Louisiana regulations.  In the case of a conflict between federal and state definitions, federal definitions shall control.  For purposes of this Consent Decree, whenever terms defined below or in Appendices 1-9 hereto are used in this Consent Decree, such definitions shall apply:

a.   Bevill-Exempt Wastes shall mean Phosphogypsum and Process Wastewater from phosphoric acid production through mineral processing, which are solid wastes excluded from hazardous waste regulation pursuant to 40 C.F.R. § 261.4(b)(7)(ii)(D) and (P);

b.   Big Holding Tank (BHT) shall mean the tank(s) that Mosaic will install as compliance projects and that are designated as Big Holding Tank(s) in the Uncle Sam Facility Report;

c.   BHT Effluent shall mean the output solution consisting of any or all of the inputs to the BHT that are described in the Uncle Sam Facility Report;

d.   BHT Recovery Units comprise the BHT and those units in Downstream Operations from which, as specified in the Uncle Sam Facility Report, cleaning wastes and other materials will be circulated to the BHT for recovery in Upstream Operations or reuse as a cleaning solution following completion of the relevant compliance projects;

e.   Complaint shall mean the complaint filed by the United States and LDEQ in this action;

f.   Consent Decree shall mean this Consent Decree and all Appendices identified in Section XXIV (Appendices) and attached hereto.  In the event of any conflict between this Consent Decree and any Appendix hereto, this Consent Decree shall control;

g.   Corrective Action Work shall mean 1) the activities described in Paragraphs 17 - 19 of Appendix 1, Attachment A;  2) the activities described in Section IV of Appendix 1,

9

Attachment B; and/or 3) other activities taken at the express direction of EPA or LDEQ pursuant to their respective legal authorities to address a release of:

(1) the following products, including intermediates and wastes: phosphoric acid, sulfuric acid, and FSA;

(2) the following cleaning solutions, including entrained wastes and solids: SACS, PACS, and FSACS;

(3) Process Wastewater, including mixtures and entrained wastes and solids;

(4) Phosphogypsum Stack System Wastewater, including mixtures and entrained wastes and solids;

(5) BHT Effluent, IGPU Effluent, or GHT Effluent, including entrained wastes and solids when such releases occur: a) within Upstream or Downstream Operations; b) from Mixed-Use, Grandfathered, or Recovery Units; or c) from the Phosphogypsum Stack System, as identified in a Facility's Facility Report.  Corrective Action Work does not include other activities to be taken at the direction of EPA or LDEQ pursuant to their residual authorities to address other releases of hazardous waste and/or hazardous constituents that may affect human health and the environment, which directions and activities will be undertaken outside of, and will not be subject to, this Consent Decree ("Non-CD Corrective Action");

h.  DAP shall mean diammonium phosphate, which is manufactured in Granulation;

i.  Day shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal or State of Louisiana holiday, the period shall run until the close of business of the next business day;

j.   Defendant or Mosaic shall mean Mosaic Fertilizer, LLC.  Mosaic's parent company, The Mosaic Company, shall be referred to by its full corporate name;

k.   Downstream Operations shall mean all Facility operations involving the storage, management, transport, treatment, disposal or further processing of the First Saleable Product, manufacturing operations that use the First Saleable Product as a feedstock, and fluorosilicic acid (FSA) production operations, unless designated as a Mixed-Use Unit or Grandfathered Unit in that Facility's Facility Report.

l.   EPA shall mean the United States Environmental Protection Agency and any of its successor departments or agencies;

m.   Effective Date is defined in Section XVI (Effective Date);

n.   Facility or Facilities shall mean any one or more of Mosaic's Louisiana operations at Uncle Sam or Saint James (Faustina), which include manufacturing plants, Phosphogypsum Stack Systems, and such other contiguous or adjacent property owned and/or operated by Mosaic, as delineated in Appendix 3 (Site Maps).

o.   Facility Reports shall mean the reports dated September 14, 2015 (Uncle Sam), and September 29, 2015 (Faustina), attached hereto collectively as Appendix 4, prepared by EPA following inspections of Mosaic's Uncle Sam and Faustina Facilities, which identify, where appropriate, the Facility's Upstream and Downstream Operations, its Mixed-Use Units, BHT Recovery Units, Grandfathered Units, Granulation Plant Units, Interim Granulation Plant Units, Granulation Sump Ditches, compliance projects, and proposed future installations;

p.   Financial Assurance shall mean financial assurance for the benefit of EPA and LDEQ in order to ensure coverage for Third-party Liability, Phosphogypsum Stack System

Closure, and Long Term Care, as set forth in Appendix 2 (Financial Assurance) of this Consent Decree;

      q.   First Saleable Product shall mean:

         (1)  Merchant Grade Acid (MGA), whether or not it is actually placed into commerce; or,

         (2)  if applicable, any intermediate phosphoric acid product with a $P_2O_5$ content less than or equal to MGA that is diverted from further processing into MGA in order to be placed into commerce, further concentrated above 54% $P_2O_5$ (by weight), or used as a feedstock in manufacturing MAP/DAP, Superphosphoric Acid (SPA), Purified Acid, or other chemical manufacturing products;

      r.   FSA shall mean fluorosilicic acid ($H_2SiF_6$).

      s.   FSA Cleaning Solution (FSACS) shall mean a solution of FSA or wastewater from FSA production (excluding waste solids not entrained in cleaning solutions but instead mechanically removed from FSA production, such as filtration residue, tank bottoms, and Swift Tower clean-out residue) with Non-Hazardous Aqueous Cleaning Solution (NHACS), Phosphogypsum Stack System Wastewater, and/or Process Wastewater used for cleaning pipes, tanks or other equipment;

      t.   Grandfathered Unit shall mean a pipe, tank and/or other production, storage, or transportation unit in Downstream Operations specifically identified in the Uncle Sam Facility Report as not feasibly segregable from Upstream Operations;

      u.   Granulation shall mean the process of converting liquid phosphoric acid, ammonia, secondary nutrients, and/or micronutrients into solid ammonium phosphate fertilizer in Downstream Operations;

v.   Granulation Plant Units (GPUs) shall mean those units identified in the Faustina Facility Report that Mosaic has installed or will install as compliance projects to manage, store or transport Downstream wastes for use in Granulation;

w.   Granulation Plant Unit Effluent (GPU Effluent) shall mean the output solution consisting of any or all of the inputs to the GPUs that are described in the Faustina Facility Report;

x.   Granulation Plant Holding Tank(s) shall mean the GPUs that Mosaic will install as a compliance project to replace certain of the IGPUs and to manage, store or transport Downstream wastes for use in Granulation.

y.   Interim Granulation Plant Units (IGPUs) shall mean those units identified in the Faustina Facility Report that manage, store or transport Downstream wastes for use in Granulation until they discontinue handling Downstream wastes in compliance with Appendix 6 (RCRA Project Narrative and Compliance Schedule) or such time as the Granulation Plant Holding Tanks are put in service to replace them.

z.   Interim Granulation Plant Unit Effluent (IGPU Effluent) shall mean the output solution consisting of any or all of the inputs to the IGPUs that are described in the Faustina Facility Report;

aa.   Granulation Sump Ditches are identified in the Faustina Facility Report.

bb.   Interest shall mean the interest rate specified in 28 U.S.C. § 1961;

cc.   LDEQ shall mean the State of Louisiana Department of Environmental Quality and any of its successor departments or agencies;

dd.   MAP shall mean monoammonium phosphate;

ee.  Merchant Grade Acid (MGA) shall mean phosphoric acid that is typically 52% to 54% (by weight) of $P_2O_5$ but may vary slightly across the phosphoric acid industry, manufactured from the direct reaction of phosphate rock and sulfuric acid and containing less than one percent (1%) solids content;

ff.  DAP Recycle Pond is the ditch and pond system described in LDEQ Permit P-0092RI and depicted in the Facility Report;

gg.  Mixed-Use Unit shall mean a pollution control device, pipe, tank and/or other production, storage, or transportation unit specifically identified in the Uncle Sam Facility Report as serving both Upstream Operations and Downstream Operations;

hh.  Non-Hazardous Aqueous Cleaning Solution (NHACS) shall mean an aqueous solution, including without limitation fresh water, non-hazardous condensate, non-hazardous recycled water, and non-hazardous recovered groundwater, used for cleaning pipes, tanks or other equipment that, if evaluated as a solid waste before use, is not a RCRA listed or characteristic hazardous waste as defined by 40 C.F.R., Part 261, Subparts C and D;

ii.  Paragraph shall mean a portion of this Consent Decree identified by an arabic numeral;

jj.  Parties shall mean the United States, LDEQ, Mosaic and, where applicable, The Mosaic Company;

kk.  Phosphogypsum shall mean calcium sulfate and byproducts produced by the reaction of sulfuric acid with phosphate rock to produce phosphoric acid.  Phosphogypsum is a solid waste within the definition of Section 1004(27) of RCRA, 42 U.S.C. § 6903(27);

ll.   Phosphogypsum Stack shall mean any defined geographic area associated with a phosphoric acid production plant in which Phosphogypsum is disposed of or stored, other than within a fully enclosed building, container or tank;

mm.     Phosphogypsum Stack System shall mean the defined geographic area associated with a phosphoric acid production facility in which Phosphogypsum and Process Wastewater is disposed of or stored, together with all pumps, piping, ditches, drainage, conveyances, water control structures, collection pools, cooling/surge ponds (including former cooling/surge ponds that have been converted to lime treatment sludge ponds), auxiliary holding ponds, regional holding ponds, and any other collection or conveyance system associated with the transport of Phosphogypsum from the phosphoric acid plant to the Phosphogypsum Stack, its management at the stack, and the Process Wastewater return to phosphoric acid production.  This definition specifically includes toe drain systems and ditches and other leachate collection systems, but does not include conveyances within the confines of the phosphoric acid or fertilizer production plant(s) or emergency diversion impoundments used in emergency circumstances caused by rainfall events of high volume or duration for the temporary storage of Process Wastewater to avoid discharges to surface waters of the State;

nn.   Phosphogypsum Stack System Wastewater shall mean waste water in the Phosphogypsum Stack System containing Bevill-Exempt Wastes commingled with hazardous wastes as alleged in the Complaint;

oo.   Phosphoric Acid Cleaning Solution (PACS) shall mean a solution of phosphoric acid (generated from an operation in which at least 50 percent of the feedstock in a calendar year was from ores or minerals or beneficiated ores or minerals) and Non-Hazardous Aqueous

Cleaning Solution, Phosphogypsum Stack System Wastewater, and/or Process Wastewater used for cleaning pipes, tanks or other equipment;

pp.  Pond 11 is the surface impoundment described in LDEQ Permit P-0063 and depicted in the Faustina Facility Report;

qq.  Process Wastewater shall mean process wastewater from phosphoric acid production.  The following wastestreams constitute process wastewater from phosphoric acid production: water from phosphoric acid production operations through concentration to the First Saleable Product; process wastewater generated from Upstream Operations that is used to transport Phosphogypsum to the Phosphogypsum Stack; Phosphogypsum Stack runoff (excluding non-contact runoff); process wastewater generated from a uranium recovery step in phosphoric acid production; process wastewater generated from non-ammoniated animal feed production (including defluorination, but excluding ammoniated animal feed production) operations that qualify as mineral processing operations based on the definition of mineral processing that EPA finalized on September 1, 1989; and process wastewater generated from a superphosphate production process that involves the direct reaction of phosphate rock with dilute phosphoric acid with a concentration less than Merchant Grade Acid [see 55 Fed. Reg. 2328, January 23, 1990];

rr.  Purified Phosphoric Acid (PPA) shall mean a refined grade of phosphoric acid where contaminants have been removed from wet-process phosphoric acid through solvent extraction, chemical precipitation, filtration, or other purification processes to produce a purified phosphoric acid product suitable for food grade or other higher purity phosphoric acid applications (as of the date of lodging of this Consent Decree, Mosaic does not manufacture Purified Phosphoric Acid);

ss.  RCRA Requirements shall mean the requirements of RCRA Subtitle C, the applicable regulations in 40 C.F.R. Parts 260-270, and La. R.S. 30:2171 et seq. and the applicable regulations in LAC 33:V.Subpart 1;

tt.  Section shall mean a portion of this Consent Decree identified by a roman numeral;

uu.  State shall mean the State of Louisiana;

vv.  Sulfuric Acid Cleaning Solution (SACS) shall mean a solution of sulfuric acid and Non-Hazardous Aqueous Cleaning Solution, Phosphogypsum Stack System Wastewater, and/or Process Wastewater used for cleaning pipes, tanks or other equipment;

ww.  Superphosphoric Acid (SPA) shall mean liquid phosphoric acid (not a solid phosphate product such as granulated triple superphosphoric acid) generally with a $P_2O_5$ content greater than MGA, resulting from the concentration of wet process acid that does not involve the direct reaction of phosphate ore in such concentration operations (as of the date of lodging of this Consent Decree, Mosaic does not manufacture SPA);

xx.  Treatment for the purposes of Paragraph 18 herein shall mean any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of a waste so as to neutralize such waste or so as to recover energy or material resources from the waste, or so as to remove or reduce a hazardous constituent of the waste or make it safer to transport, store, or dispose of, or amenable for recovery, amenable for storage, or reduced in volume;

yy.  United States shall mean the United States of America, acting on behalf of EPA;

zz.  Upstream Operations shall mean all phosphoric acid mineral processing operations resulting in the manufacture of the First Saleable Product; and

17

aaa.  Work shall mean any activity that Mosaic must perform to comply with the requirements of this Consent Decree, including Appendices.

## IV.  CIVIL PENALTY

9.      Within thirty (30) Days after the Effective Date of this Consent Decree, Mosaic shall pay the sum of $3,900,000.00 as a civil penalty, together with Interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the date of lodging, in accordance with Paragraphs 10 and 11.

10.      Mosaic shall pay the sum of $2,350,000.00, together with Interest accruing from the date on which the Consent Decree is lodged with the Court, to the United States by FedWire Electronic Funds Transfer (EFT) to the U.S. Department of Justice, in accordance with written instructions to be provided by the Financial Litigation Unit of the U.S. Attorney's Office for the Eastern District of Louisiana, 500 Poydras Street, Suite 210, New Orleans, Louisiana, 70130 (504) 680-3000 to Mosaic within ten (10) days of lodging of the Consent Decree.  At the time of payment, Mosaic shall send a copy of the EFT authorization form and the EFT transaction record, together with a transmittal letter, to the United States in accordance with Section XV (Notices) of this Consent Decree; by email to acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, OH 45268

The transmittal letter shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in United States et al. v. Mosaic Fertilizer, LLC, and shall reference the civil action number and DOJ case number 90-7-1-08388.

11.      Mosaic shall pay the sum of $1,550,000.00 as a civil penalty, together with Interest accruing from the date on which the Consent Decree is lodged with the Court, to LDEQ by EFT in accordance with instructions that will be provided by LDEQ within ten (10) Days of

the lodging of this Consent Decree.  At the time of payment, Mosaic shall send a copy of the

EFT authorization form and the EFT transaction record, together with a transmittal letter, to

LDEQ in accordance with Section XV (Notices) of this Consent Decree.  The transmittal letter

shall state that the payment is for a civil penalty owed pursuant to the Consent Decree in United

States et al. v. Mosaic Fertilizer LLC, and shall reference LDEQ File Number 015-176-SET-

038and DOJ case number 90-7-1-08388.

13.     12.     Mosaic shall not deduct any penalties paid under this Consent Decree pursuant to

this Section or Section IX (Stipulated Penalties) in calculating its federal or Louisiana or local

income tax.

## V.  COMPLIANCE REQUIREMENTS

13.     <u>Compliance Projects and Schedule</u>.

(a)     <u>Completed Activities</u>. Mosaic has already completed the following activities at

the Faustina Facility in compliance with the below-referenced Consent Decree Paragraph(s) or

Appendices/Attachments to this Consent Decree: Granulation Plant Sump System (Paragraph

16); Phase 1 of the DAP Pond Sampling and characterization (Paragraph 23).

(b)     <u>Uncle Sam Facility</u>.  Mosaic shall undertake the actions set forth in Appendix 5

(Best Management Practices (BMP) Plan) and Appendix 6 (RCRA Project Narrative and

Compliance Schedule) of this Consent Decree to improve its waste management practices,

pursuant to the description and schedule set forth in Appendix 6 (RCRA Project Narrative and

Compliance Schedule).  For any wastes generated by or managed in units that are identified in

Section VI (Compliance Projects) of the Uncle Sam Facility Report found in Appendix 4

(Facility Reports) as part of the compliance projects set forth in Appendix 6 (RCRA Project

Narrative and Compliance Schedule) requiring installation, construction, modification, shut

down, or replacement to cease commingling of hazardous wastes with Bevill-Exempt Wastes, and for any wastes that will be managed differently as a result of installing, constructing, modifying, shutting down, or replacing units, as specified in Section VI (Compliance Projects) of Appendix 4 (Facility Reports), Mosaic's waste management obligations under this Section V (Compliance Requirements) shall become effective upon completion of those compliance projects.

(c)    <u>Faustina Facility</u>.  Mosaic shall implement certain Facility changes at the Faustina Facility pursuant to the description and schedule set forth in the Faustina Facility Report found in Appendix 4 (Facility Reports) and Appendix 6 (RCRA Project Narrative and Compliance Schedule).  For any wastes that will be managed differently as a result of installing, constructing, modifying, shutting down, or replacing units, as specified in Section VI (Compliance Projects) of Appendix 4 (Facility Reports), Mosaic's waste management obligations under this Section V (Compliance Requirements) shall become effective upon completion of those compliance projects.

14.    <u>Hazardous Waste Determinations</u>.

(a)    <u>Uncle Sam Facility</u>.  Mosaic shall make a RCRA hazardous waste determination, pursuant to 40 C.F.R. § 262.11, of all solid wastes generated at the Uncle Sam Facility within Upstream or Downstream Operations, or from Mixed-Use, Grandfathered Units, or BHT Recovery Units other than:  (1) Bevill-Exempt Wastes; and (2) those wastes that Paragraphs 15-18 of this Consent Decree allow to (i) be input to Upstream Operations or (ii) managed in BHT Recovery Units or (iii) managed with Bevill Exempt Wastes, and, if the wastes are hazardous wastes, Mosaic shall manage such wastes in compliance with the RCRA Requirements.

(b)    Faustina Facility.  Mosaic shall make a RCRA hazardous waste determination, pursuant to 40 C.F.R. § 262.11, of all solid wastes generated at the Faustina Facility other than those wastes that Paragraph 16 allows to be input to Granulation or managed in IGPUs, GPUs or the Granulation Sump Ditches, and, if the wastes are hazardous wastes, Mosaic shall manage such wastes in compliance with the RCRA Requirements.

15.    Wastes from Upstream Operations and Co-Managed Wastes at the Uncle Sam Facility.

(a)    Provided that any Phosphogypsum Stack System ultimately receiving the wastes enumerated below is subject to the requirements of Appendix 1, Attachment B (Groundwater Requirements), Attachment C (Phosphogypsum Stack System Construction and Operational Requirements), and Sections I, II, III and VI of Attachment D (Closure of Phosphogypsum Stacks/Stack Systems), as modified by Paragraph 22(a)(2)(i), and the Financial Assurance requirements of this Consent Decree set forth in Paragraph 25 and Appendix 2 (collectively the Stack System Requirements), the following wastes may be: (i) input into Upstream Operations; or (ii) treated, stored, managed, transported or disposed of together with Bevill-Exempt Wastes in accordance with this Consent Decree:

(1)    Process Wastewater, Phosphogypsum Stack System Wastewater, and Phosphogypsum;

(2)    Wastes from air pollution control devices that are associated with Upstream Operations or that are identified as Mixed-Use Units in the Uncle Sam Facility Report; and

(3)    Wastes generated from the use of Phosphogypsum Stack System Wastewater, Process Wastewater, a Non-Hazardous Aqueous Cleaning Solution, or any combination thereof, to clean pipes, tanks, process equipment, or other

storage or transport units that are:

        (i)      Part of Upstream Operations;

        (ii)     Serve to manage, store, or transport Bevill-Exempt Wastes; or

        (iii)    Identified as Mixed-Use or Grandfathered Units in the Uncle Sam Facility Report.

        (b)      Prior to commencement of operations of Compliance Project 1 (Big Holding Tank and Wash Solution System in the Phosphoric Acid Plant) and Project 2 (Cleaning Solution Return Piping) of Section VI (Compliance Projects) of Appendix 4 (Facility Reports) at the Uncle Sam Facility, Mosaic may continue to manage wastes generated from Upstream Operations, Mixed-Use Units, Grandfathered Units, BHT Recovery Units, or units that serve to manage, store, or transport Bevill-Exempt Wastes as specifically documented in  Mosaic's consolidated waste management practices submittal dated September 8, 2015.

        (c)      Following commencement of operations of Compliance Project 1 (Big Holding Tank and Wash Solution System in the Phosphoric Acid Plant) and Project 2 (Cleaning Solution Return Piping) of Section VI (Compliance Projects) of Appendix 4 (Facility Reports) for the Uncle Sam Facility, the following wastes may be input to Upstream Operations via the BHT as described in Projects 1 and 2 of Section VI (Compliance Projects) of the Uncle Sam Facility Report set forth in Appendix 4 and in accordance with the BMP set forth in Appendix 5:

        (1)      Spills and leaks of all grades of phosphoric acid, sulfuric acid, FSA, SACS, PACS, FSACS, or BHT Effluent; or NHACS, Process Wastewater, or Phosphogypsum Stack System Wastewater when mixed with any of the preceding solutions due to spills, leaks, or cleaning of spills and leaks;

22

(2)      Wastes generated from the use of SACS, PACS, BHT Effluent, FSA, FSACS, NHACS, Process Wastewater, and/or Phosphogypsum Stack Wastewater to clean pipes, tanks, process equipment, or other storage or transport units that are:

(i)      Part of Upstream Operations;

(ii)      Serve to manage, store, or transport Bevill-Exempt Wastes; or

(iii)      Identified as Mixed-Use, Grandfathered, or BHT Recovery Units in the Uncle Sam Facility Report.

In the event of a process upset after commencement of operations of the BHT and Cleaning Solution Return Piping Projects that prevents the input of SACS, PACS, BHT Effluent, FSA, or FSACS to Upstream Operations via the BHT, Mosaic: (1) shall not discharge to the Phosphogypsum Stack System  any SACS, PACS, BHT Effluent, FSA, or FSACS in cleaning those units affected by the process upset; and (2) shall make a RCRA hazardous waste determination, pursuant to 40 C.F.R. § 262.11, of any cleaning wastes generated from BHT Recovery Units and not input to the BHT and, if the wastes are hazardous, shall manage such wastes in compliance with the RCRA Requirements.

(d)  If Mosaic, in the cleaning of Upstream Operations, Mixed-Use, Grandfathered, or BHT Recovery Units, uses any cleaning materials other than Phosphogypsum Stack System Wastewater, Process Wastewater, BHT Effluent, PACS, SACS, FSA, FSACS, or NHACS that, if evaluated as a solid waste before use, would be a RCRA listed or characteristic hazardous waste as defined by 40 C.F.R., Part 261, Subparts C and D and would generate a hazardous waste when mixed with Bevill-Exempt Process Wastewater under the Bevill Mixture Rule, 40 C.F.R. §

261.3(a)(2)(i) and (g)(4), then Mosaic shall make a RCRA hazardous waste determination pursuant to 40 C.F.R. § 262.11, of the cleaning waste and, if the waste is hazardous, Mosaic shall manage such waste in compliance with the RCRA Requirements.

(e)     Mosaic shall manage any solids removed by means other than cleaning solutions from Upstream Operations, Mixed-Use, Grandfathered, and BHT Recovery Units in accordance with the BMP set forth in Appendix 5.

(f)     Equipment maintenance, repair activities, and emergency situations in Downstream Operations at a Facility may occasionally require Mosaic to temporarily store or transport a First Saleable Product in or through tanks or pipes that are part of Upstream Operations, and/or Mixed-Use or Grandfathered Units. Provided that: a) the use of any individual unit in Upstream Operations, or any Mixed-Use or Grandfathered Unit, for such temporary storage of a First Saleable Product does not exceed ninety (90) Days consecutively or one-hundred twenty (120) Days cumulatively per calendar year; and b) if the First Saleable Product is not stored or transported for greater than ninety (90) Days consecutively outside of Downstream Operations, then the cleaning wastes generated from such units that are used for the temporary transport and storage of the First Saleable Product may be managed with wastes from Upstream Operations. Notice of such temporary use of tanks or pipes that are part of Upstream Operations, or of Mixed-Use or Grandfathered Units, for a First Saleable Product must be given to EPA and LDEQ within seven (7) Days of the commencement of such temporary use, but advance approval will not be required.  Mosaic shall keep a log of all such temporary uses. If Mosaic violates any of the time limits set forth in this Paragraph, Mosaic shall not manage cleaning wastes generated outside the prescribed time period with wastes from Upstream Operations.  In the event of a second violation of any of these time limits within three-hundred

and sixty-five (365) Days of a first violation, Mosaic within 30 Days shall construct a separate system for the temporary transport and storage of the First Saleable Product, which system shall be part of Downstream Operations. Violations of the time limits set forth in this Paragraph are not subject to Paragraph 32 (Correction of Non-Compliance) but may be subject to dispute resolution (but not judicial review) under Section XI of this Consent Decree (Dispute Resolution) or to a claim under Section X (Force Majeure).

16.     <u>Wastes from Downstream Operations at Uncle Sam and Faustina</u>.  Unless otherwise authorized by Paragraphs 15(a), (b), (c), (e) or (f), Paragraphs 16  (a) - (c), or Paragraphs 17(a) or (b), below, Mosaic shall manage all hazardous wastes generated from: Downstream Operations (including, without limitation, units that transport, store, treat, or manage the First Saleable Product (<u>e.g.</u>, pipes, tanks, railcars, barges); chemical manufacturing processes that use the First Saleable Product as a feedstock (<u>e.g.</u>, MAP/DAP, SPA or PPA processes); FSA production processes; pollution control devices, waste storage, transport and treatment units, cleaning wastes (liquid and solids), and spills and leaks from all such processes and units) in compliance with the RCRA Requirements, regardless of the use of any Bevill-Exempt Wastes as influent to such Downstream Operations. If any Mixed-Use Units or Grandfathered Units are replaced, modified, or reconfigured after the date of the Uncle Sam Facility Report such that they serve to manage, store or transport materials from Downstream Operations that are not identified in that Facility Report as being associated with those Units, they will be deemed to serve Downstream Operations, and any hazardous wastes generated thereafter from such Units will be subject to this Paragraph.

(a)     <u>Waste Management at Uncle Sam</u>.  Mosaic may re-use or recover certain wastes from Downstream Operations in Upstream or Downstream Operations as specifically

documented in the Uncle Sam Facility Report.

(b) <u>Waste Management at Faustina</u>. The Faustina Facility does not engage in mineral processing and does not generate Bevill-Exempt wastes.  All solid wastes generated at the Faustina Facility as described in Faustina's Facility Report are generated from Downstream Operations. Prior to completion of the Faustina Facility changes required pursuant to Paragraph 13(c) above, Mosaic may continue to manage wastes from the Granulation Sump Ditches, IGPUs, and GPUs as specifically documented in  Mosaic's consolidated waste management practices submittal dated September 8, 2015. Upon completion of Faustina Project 3 (Granulation Plant Holding Tank Installation) set forth in Appendix 6 (RCRA Project Narrative and Compliance Schedule), Mosaic shall no longer use the IGPUs to manage wastes.

(1) <u>Cleaning Wastes</u>. Wastes generated from the use of NHACS, SACS, IGPU Effluent or GPU Effluent to clean pipes, tanks, process equipment, or other storage or transport units and spills and leaks of NHACS, IGPU Effluent, GPU Effluent, SACS, phosphoric acid, or sulfuric acid may be input to Granulation, as described in Section V (Current Configuration) of Faustina's Facility Report.  In the event of a process upset that prevents the input of such wastes to Granulation , Mosaic shall make a RCRA hazardous waste determination of the cleaning wastes generated from those units affected by the process upset, pursuant to 40 C.F.R. § 262.11 and, if the wastes are hazardous, shall manage such wastes in compliance with the RCRA Requirements.

(2) <u>Projects</u>.   Mosaic has already modified certain of the containment pads and sumps at the Faustina Facility, as identified in the Faustina Facility Report.

_          (i) <u>Granulation Sump Ditches</u>.  Mosaic shall implement Project 9 (Inspections, Maintenance and Repair of Ditches Flowing in the Granulation Sump) for the

Granulation Sump Ditches in compliance with Appendix 6 (RCRA Project Narrative and Compliance Schedule) for Project 9 and thereafter shall manage the Granulation Sump Ditches in compliance with Project 9.

(ii)  <u>IGPUs</u>. Mosaic shall implement Projects 4 (Interim Granulation Plant Units - Tanks and Transfer Lines Operating Requirements) and 5 (Interim Granulation Plant Units - Sump Operating Requirements) for all IGPUs in compliance with Appendix 6 (RCRA Project Narrative and Compliance Schedule) until completion of Faustina Project 3 (Granulation Plant Holding Tank Installation) set forth in Appendix 6 (RCRA Project Narrative and Compliance Schedule).

(iii) <u>Other Projects</u>. Mosaic shall implement Projects 3 (Granulation Plant Holding Tank Installation), 6 (RCRA Requirements), 7 (40 CFR Part 265, Subpart J- Tank Standards for the Granulation Sump), 8 (40 CFR Part 265, Subpart J- Tank Standards for the Existing Holding Tank Sump), and 10 (RCRA Training) in compliance with and on the schedules set forth in Appendix 6 (RCRA Project Narrative and Compliance Schedule). Upon completion of those projects, Mosaic shall comply with 40 C.F.R. Parts 262 and 265 and the regulations in LAC 33:V. Ch. 11 and 19.

Notwithstanding the foregoing requirements of this Paragraph 16(b), Mosaic may re-use or recover certain wastes generated at the Faustina Facility in Downstream Operations as specifically documented in the Faustina Facility Report.

17.  <u>FSA at the Uncle Sam Facility</u>.

(a)  FSA, and wastewater carrying entrained solids from FSA production, a part of Downstream Operations, may be managed as described in Section IV.D (Fluorosilicic Acid

(FSA) Standard Process Configuration) and Section VI Compliance Project 1 (BHT) and Project 3 (BHT piping) of Appendix 4 (Facility Reports) for the Uncle Sam Facility.

       (b)      Waste solids not entrained in cleaning solutions but instead mechanically recovered from FSA production (such as filtration residue, tank bottoms, and Swift Tower clean-out residue) shall be managed in accordance with the BMP Plan set forth in Appendix 5.

       (c)      Wastes generated from FSA production that are not subject to Paragraphs 17(a) and 17(b) shall be managed in compliance with the RCRA Requirements.

       18.      <u>Wastes from Treatment of Uncle Sam Phosphogypsum Stack System Wastes</u>. Provided that any Phosphogypsum Stack System ultimately receiving the wastes complies with the Stack System Requirements set forth in Paragraph 15(a), wastes generated from the Treatment of materials in the Phosphogypsum Stack System through (i) the use of reverse osmosis or (ii) any other Treatment process that does not introduce into such materials hazardous constituents or other contaminants that would result in a violation of applicable discharge limits may be: (1) input to Upstream Operations; or (2) treated, stored, managed, transported and disposed of together with Bevill-Exempt Wastes, in accordance with this Consent Decree.

       19.      <u>Transfer of Wastes between the Facilities</u>.  In the event that Mosaic transfers hazardous waste, or Bevill-Exempt Wastes historically commingled with hazardous waste, between the Facilities, Mosaic shall comply with the RCRA Requirements. Nothing in this Consent Decree shall restrict the transfer and management of Bevill-Exempt Wastes and non-hazardous waste between the Facilities that is in compliance with all federal and Louisiana laws.

       20.      <u>Sulfuric Acid Plant</u>.  Mosaic shall manage hazardous wastes generated at the Uncle Sam sulfuric acid plant in accordance with applicable law.

21.   <u>Site Assessment and Corrective Action</u>.

(a)   Mosaic has already completed or will complete certain site assessment activities pursuant to existing RCRA Section 3013 Orders for both Facilities that are deemed to satisfy the requirements of Paragraphs 1-16 of Appendix 1, Attachment A (Site Assessment, Reporting and Corrective Action). Mosaic's obligation to complete the Corrective Action Work are part of the Work required by this Consent Decree, but shall be set forth in and governed by an administrative agreement, permit, or order issued by LDEQ under its authorized state program, and subject to EPA's residual RCRA authorities under RCRA and Paragraphs 21(c) and 88 of this Consent Decree.  Mosaic's performance of its obligations pursuant to the preceding sentence shall be subject to Paragraph 9 - 16 of Appendix 1, Attachment A, as applicable.

(b)   Mosaic's obligations under Paragraphs 17-19 of Attachment A of Appendix 1 shall be deemed to be fully satisfied with regard to each Facility on the date that LDEQ confirms Mosaic's certification that Mosaic has completed all requirements of any such administrative agreement, permit, or order issued by LDEQ to govern the Corrective Action Work defined in Paragraph 8(g)(1), provided that EPA does not exercise its residual authorities under RCRA and this Consent Decree as set forth in Paragraph 21(c), below.  Appendix 1, Attachment A is included as part of this Consent Decree in order to advise the Court and the public of sampling and analysis activities already completed or that will be completed by Mosaic, pursuant to the RCRA Section 3013 Orders, as part of its settlement with the United States and LDEQ, and the Parties' intent to implement any necessary risk assessment and/or Corrective Action Work under LDEQ's administrative authorities, and to reflect Plaintiffs' residual authority to secure necessary Corrective Action Work pursuant to their reservation of rights in Paragraphs 86 and 88 of this Consent Decree.

(c)     EPA reserves the right to fully and directly enforce  all the requirements of Appendix 1, Attachment A, if EPA:  (i) notifies Mosaic within sixty (60) Days of LDEQ's issuance of an administrative agreement, permit, or order setting forth and governing the Corrective Action Work defined in Paragraph 8(i)(a), that such administrative agreement, permit, or order does not  adequately address the Corrective Action Work required under Paragraph 18 of Appendix 1, Attachment A; (ii) after consultation with LDEQ, notifies Mosaic that it has determined that Mosaic is not in compliance with an issued administrative agreement, permit, or order or (iii) notifies Mosaic within sixty (60) Days of LDEQ's failure to issue an administrative agreement, permit, or order for Corrective Action Work that should be required under the terms of Paragraph 18 of Appendix 1, Attachment A.  Any decision by EPA to directly enforce these Work requirements shall not be subject to judicial review, but shall be subject to dispute resolution (other than judicial review) pursuant to Section XI (Dispute Resolution) of this Consent Decree, although Mosaic retains its right to invoke dispute resolution as set forth in Section XI (Dispute Resolution) regarding any liability for asserted non-compliance with the Work requirements of this Consent Decree, including any liability for stipulated penalties.

22.     Phosphogypsum Stack Systems at the Facilities.

(a)     Uncle Sam Facility. If Mosaic is in compliance with the requirements of Paragraph 22(a), such compliance shall be deemed to satisfy the corresponding requirements of the Louisiana Solid Waste Management and Resource Recovery Law (La. R.S. 30:2151 et seq.) and the regulations promulgated thereunder (LAC 33:VII, Subpart 1), applicable to Phosphogypsum Stack Systems, with respect to the Uncle Sam Phosphogypsum Stack System.

(1)  Mosaic shall comply with all requirements set forth in Appendix 1, Attachment B (Groundwater Requirements), Attachment C (Phosphogypsum Stack System

Construction and Operational Requirements), Attachment D (Closure of Phosphogypsum

Stacks/Stack Systems), Attachment E (Critical Conditions and Temporary Measures), and

Attachment G (Phosphogypsum Stack System Closure Application) at the Uncle Sam Facility,

except as provided in Appendix 8 (Underground Injection Control (UIC) Permitted Well at

Uncle Sam).  The Parties agree that AOC MM-AOA-14-00269 shall be terminated as a separate

order as of the Effective Date.

(2)  Liner Alternatives.

(i)  Plaintiffs agree that the Uncle Sam Phosphogypsum Stack System, subject

to Mosaic's completion of the Work required pursuant to Appendix 7 (Liner Compliance

Requirements, Exemptions and Conditions) of this Consent Decree, either (i) meets the liner

requirements of Appendix 1, Attachment C (Phosphogypsum Stack System Construction and

Operational Requirements); or (ii) complies or will comply with the requirements, exemptions

and conditions of Appendix 7 (Liner Compliance, Exemptions and Conditions) upon completion

of the projects identified in Appendix 7, and thereby are or will be deemed to be environmentally

protective and an acceptable alternative to the requirements of Appendix 1, Attachment C

(Phosphogypsum Stack System Construction and Operational Requirements).

(ii)  In the event that Mosaic determines that it is not in compliance with the

requirements, exemptions, and/or conditions set forth in Appendix 7 for the Uncle Sam Facility,

Mosaic within ninety (90) Days of identifying the non-compliance shall investigate the cause of

the non-compliance and submit an Evaluation of Remedial Options to address the non-

compliance for approval by EPA, in consultation with LDEQ. The Evaluation of Remedial

Options must: (i) evaluate the cause of the failure to meet the requirements and/or conditions in

Appendix 7; (ii) identify and evaluate those measures needed to return to compliance with

Appendix 7; (iii) identify and evaluate potential remedial alternatives to address any groundwater contamination that has migrated beyond the Point(s) of Compliance for the Uncle Sam Facility as provided in Appendix 1, Attachment B (Section IV); (iv) identify and evaluate potential remedial alternatives to prevent or mitigate further migration of groundwater contamination; and (v) recommend one of the identified remedial alternatives for implementation.

(iii)     If EPA, in consultation with LDEQ, determines that Mosaic is not in compliance with the requirements, exemptions, and/or conditions set forth in Appendix 7 for a the Uncle Sam Facility, EPA shall so notify Mosaic in a written statement explaining the basis for its conclusion.  Within ninety (90) Days of receiving such notice from EPA, Mosaic shall submit to EPA for approval, in consultation with LDEQ, the Evaluation of Remedial Options as required by Paragraph 22(a)(ii) or shall submit pursuant to Paragraphs 27-31 a written explanation of why it does not believe the alleged failure exists.

(3)  If Mosaic determines to construct a Lateral Expansion of the existing Uncle Sam Phosphogypsum Stack System adjacent to the existing Phosphogypsum Stack System (e.g., "Expansion Stack 5A") with an alternative design different than Appendix 1, Attachment C, Section VI, then, no less than eighteen months prior to the start of construction of Expansion Stack 5A, Mosaic shall submit a proposed design to EPA and LDEQ for their review and approval, and a solid waste permit major modification request to LDEQ in accordance with applicable provisions of the Louisiana Solid Waste regulations. Any Phosphogypsum Stack System expansion documentation submitted pursuant to Appendix 2 (Financial Assurance) shall not affect LDEQ's permit authority under the Louisiana Solid Waste regulations.  If LDEQ approves an alternative liner in accordance with applicable Louisiana Solid Waste Regulations,

which is subject to "EPA review" under Paragraph 31, the alternative liner shall be deemed to satisfy the liner requirements of Appendix 1, Attachment C, Section VI.

(4)  Mosaic shall submit the Initial Phosphogypsum Stack System Closure Plan required in Appendix 1, Attachment D, Section II simultaneously with its first annual updated Cost Estimate submitted pursuant to Appendix 2, Paragraph 4(b).

(b)  Faustina Facility.  Mosaic shall comply with Section VI (Long Term Care for Phosphogypsum Stacks/Stack Systems) requirements of Appendix 1, Attachment D (Closure of Phosphogypsum Stacks/Stack Systems), all groundwater monitoring requirements of Attachment B (Groundwater Requirements), and Section I of Attachment E (Critical Conditions and Temporary Measures) for the Faustina Facility.  If Mosaic is in compliance with the approved post-closure plan for this Facility, such compliance shall be deemed to satisfy the Work requirements of Appendix 1, Attachment D.

23.  DAP Recycle Pond at the Faustina Facility.  Mosaic shall comply with requirements in Appendix 6 (RCRA Project Narrative and Compliance Schedule) regarding EPA and LDEQ's April 9, 2014 approval of Mosaic's Sampling and Analysis Report and future closure of the DAP Recycle Pond.  Mosaic shall not place wastes in the DAP Recycle Pond, but may continue to use the DAP Recycle Pond to collect stormwater.  Provided that Mosaic complies with this requirement, it shall not be required under this Consent Decree to conduct additional sampling of the DAP Recycle Pond, although EPA and LDEQ reserve all authorities to require sampling under applicable federal or state law. The final plan for the closure of the DAP Recycle Pond is subject to the LDEQ Risk Evaluation/Corrective Action program (RECAP), and Paragraphs 27-31.

24.     Aboveground Facilities for the Permitted UIC Well.  Mosaic shall comply with Appendix 8 (Underground Injection Control (UIC) Permitted Well at Uncle Sam).

25.     Financial Assurance.  Mosaic shall secure and maintain Financial Assurance for the benefit of EPA and LDEQ pursuant to the requirements of Appendix 2 (Financial Assurance) of this Consent Decree as specified in Paragraphs 25(a) and 25(b) below.  Mosaic's inability to secure and/or maintain adequate Financial Assurance for the Uncle Sam and/or Faustina Facilities shall in no way excuse performance of the Work or any other requirement of this Consent Decree.

(a)     Uncle Sam Facility.   Mosaic shall secure and maintain Financial Assurance for the benefit of EPA and LDEQ pursuant to the requirements of Appendix 2 (Financial Assurance) of this Consent Decree, in order to ensure coverage for: (i) Third-party Liability; and (ii) Phosphogypsum Stack System Closure and Long-Term Care, including for subsection (ii) a corporate guarantee  provided by The Mosaic Company and attached hereto as Appendix 2, Attachment I.

(b)     Faustina Facility.  Mosaic shall secure and maintain Financial Assurance for the benefit of EPA and LDEQ pursuant to the requirements of Appendix 2 (Financial Assurance) of this Consent Decree, in order to ensure coverage for: (i) Third-party Liability; and (ii) Phosphogypsum Stack System Closure and Long-Term Care, including for subsection (ii) a corporate guarantee  provided by The Mosaic Company and attached hereto as Appendix 2, Attachment I,, for the DAP Recycle Pond.

(c)     If Mosaic establishes Financial Assurances under Paragraphs 25(a) and 25(b) pursuant to the requirements of Appendix 2, such Financial Assurances shall also satisfy Mosaic's obligations to comply with LAC 33:V. Chapter 37 and LAC 33:VII. Chapter 13,

including the reporting requirements thereof,  with respect to (a) Closure and Post-Closure Care for the Phosphogypsum Stack System at the Uncle Sam Facility, (b) Post-Closure Care for the Phosphogypsum Stack System at the Faustina Facility, and (ii) Closure and Post-Closure Care for the  DAP Recycle Pond at the Faustina Facility.

      (d)   <u>Corrective Action Work at Uncle Sam and Faustina Facilities</u>.   In the event that LDEQ or EPA determine that, pursuant to Paragraphs 21 or 22, Corrective Action Work is required, then Financial Assurance for the Corrective Action Work shall be addressed through an administrative agreement, order, or the modification of the affected Facility's solid waste permit in the manner provided in LAC 33:VII.1305.  If EPA, in lieu of LDEQ, directs Corrective Action Work pursuant to this Consent Decree, then Mosaic shall secure and maintain Financial Assurance for Corrective Action Work for the benefit of EPA pursuant to Appendix 2, Section IV.

      26.    In addition to the financial assurance information included in the reports required pursuant to Section VIII (Reporting Requirements) of this Consent Decree, Mosaic or The Mosaic Company as guarantor shall provide to EPA and LDEQ, upon request, any information or reports that Plaintiffs are authorized to request pursuant to Section 3007 of RCRA, 40 C.F.R. Part 264 Subpart H, La. R.S. 30:2001 et seq. and LAC 33:VII.Chapter 13, or any other applicable statutory or regulatory information-gathering authorities, regarding the financial status of Mosaic or The Mosaic Company as guarantor, the financial mechanism(s) provided by Mosaic or The Mosaic Company as guarantor to meet its obligation for Financial Assurance, and the financial institution or guarantor providing the financial mechanism(s) to secure Mosaic's or The Mosaic Company's obligations, pursuant to Appendix 2 (Financial Assurance).

27.    <u>Review and Approval of Submissions</u>.  Where any provision of this Consent Decree requires Mosaic to submit a plan, notification, report, procedure, protocol or other deliverable, the submission shall be subject to either "EPA approval" or "EPA review," as set forth in Paragraphs 28-31, below.  If there is any question as to whether a particular submission requires EPA approval or review, it shall be submitted for approval subject to EPA's discretion to treat it as a submission for review.  All work plans, reports and other items that are developed and submitted to EPA for approval pursuant to this Consent Decree shall be complete and technically adequate, and shall incorporate all applicable requirements of Appendix 1.

28.    <u>Submissions Subject to EPA Approval</u>.  After review of any work plan, report, or other item set forth below that is required to be submitted, or revised and resubmitted to EPA for approval pursuant to this Consent Decree, EPA, after consultation with LDEQ, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.  In the event of disapproval of any portion of the submission, EPA shall include a statement of the reasons for such disapproval in its response.  The following submissions required under Appendix 1 are subject to EPA approval:

1.    Groundwater Monitoring Plan (Attachment B, Section II (1) and (2));
2.    Stack Closure Plan (Attachment D, Section I, Section III (1));
3.    Initial Stack Closure Plan (Attachment D, Section II (1));
4.    Corrective Action Plan (Attachment A, (18)) and Attachment B, Section IV (3));
5.    Interim Stack System Monitoring Program and Monitoring Program Revisions (Attachment C, Section I (6));
6.    Dike Concerns, including Problems, Proposals to Upgrade or Retrofit Dikes, Submissions of Interim Measures for Dike Stability and Submissions of Proposals to Modify the Existing Dike System (Attachment C, Section II (1), (2), (3) and (5));
7.    Liners for New Stack Systems Construction: (1) Submission of Construction Quality Assurance Plan for Composite Liner Design; (2) Provision of Liner System Installation Report of Compliance with

Construction Quality Assurance Plan after Installation of Liner is Complete; (3) Submission of Documentation of Quality Control Testing of the Liner Construction (Attachment C, Section VI);

8.   Alternatives Plan and Implementation Schedule for Water Management (Attachment C, Section VII 6(h) and (7)(c));

9.   Requests for Temporary Deactivation of Stack System on a Yearly Basis (Attachment D, Section IV (1) - (7));

10.   Use of Closed Phosphogypsum Stack Systems (Attachment D, Section V (5));

11.   Reduced Long-Term Care Schedule (Attachment D, Section VI (2));

12.   Submission of outline for a Sampling and Analysis Workplan (Attachment A, (1));

13.   Submission of Sampling and Analysis Workplan and Sampling and Analysis Report (Attachment A, (2) and (5));

14.   Submission of Risk Assessment Plan and Report (Attachment A, (18));

15.   Submission of an Interim Measures Plan and Report (Attachment A, (18));

16.   Approval to Construct Perimeter Dikes that do not meet minimum 1.5 safety factor (Attachment C, Section III, (1)(e)(ii)):

17.   Alternate Final Cover (Attachment D, Section III, (7)(c)); and

18.   Corrective Action Certification Report (Attachment A (18)(a)(iii).

29.   <u>Approval or Conditional Approval</u>.  If the submission is approved pursuant to Paragraph 28(a), Mosaic shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part, pursuant to Paragraph 28(b) or (c), Mosaic shall, upon written direction from EPA, take all actions required by the approved plan, report, or other item that EPA determines are technically severable from any disapproved portions, subject to Mosaic's right to dispute only the specified conditions, the disapproval, or the determination of the technical severability of portions of the submission under Section XI (Dispute Resolution) of this Consent Decree.

30.   <u>Disapproval in Whole or Part</u>.

(a)   If the submission is disapproved in whole or in part pursuant to Paragraph 28(c) or 28(d), Mosaic shall, within sixty (60) Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved

portion thereof, for approval, in accordance with the preceding Paragraphs.  If the submission

has been previously disapproved, EPA may impose an earlier due-date for resubmission, but not

less than fourteen (14) Days.  If the resubmission is approved in whole or in part, Mosaic shall

proceed in accordance with the provisions of this Paragraph governing approval of submissions.

(b)      If a resubmitted plan, report, or other item, or portion thereof, is disapproved in

whole or in part, EPA, after consultation with LDEQ, may again require Mosaic to correct any

deficiencies in accordance with the preceding Paragraphs, may itself correct any deficiencies, or

may finally disapprove the submission, subject to Mosaic's right to invoke dispute resolution

under Section XI (Dispute Resolution) and the right of EPA and LDEQ to seek stipulated

penalties as provided in the following Sub-Paragraph.  If the resubmission is approved or

corrected in whole or in part, Mosaic shall proceed in accordance with Paragraph 29.

(c)      Any stipulated penalties applicable to the original submission, as provided in

Section IX (Stipulated Penalties) of this Consent Decree, shall accrue during the sixty (60) Day

period or other agreed upon period, but shall not be payable unless the resubmission is untimely

or is disapproved in whole or in part; provided that, if the original submission was so deficient as

to constitute a material breach of Mosaic's obligations under this Consent Decree, the stipulated

penalties applicable to the original submission shall be due and payable notwithstanding any

subsequent resubmission.

31.      Submissions Subject to EPA Review.  For submissions set forth below that are

subject to EPA review, EPA, in consultation with LDEQ, within 60 Days of receiving the

submission may provide written comments on the submission, in whole or in part, or EPA may

decline to comment, or may notify Mosaic that comments will be provided at a later date not to

exceed 120 Days from the date of submission.  If EPA provides written comments, Mosaic

within 45 Days of receiving such comments shall modify the submission consistent with EPA's written comments unless it has invoked Dispute Resolution pursuant to Section XI of the Consent Decree.  A decision by EPA to decline to comment does not constitute approval of the submission or waive any obligation by Mosaic to comply with the requirements of this Consent Decree or any applicable federal, Louisiana, or local laws governing such submissions.

The following submissions required by Appendix 1 and this Consent Decree are subject to EPA review:

1. Groundwater Monitoring Well Reports (Attachment B, Section II (3)(a) and (b));
2. Inspection of Phosphogypsum Stack Report (Attachment C, Section VII (3));
3. Information on Perimeter Dikes (Attachment C, Section II (1));
4. Report on Final Survey and Record Drawings after Permanent Closure is complete (Attachment D, Section V (2));
5. Certification of Closure Construction Completion (Attachment D, Section V (3));
6. Certification of Long-Term Care Completion (Attachment D, Section VI (4));
7. Notification of Groundwater Sampling Schedule (Attachment B, Section II (3)(d));
8. Notification of Start Date of Construction of New Dikes (Attachment C, Section III (5)(a));
9. Report on Conditions for Temporary Non-emergency Use of the Design Freeboard (Attachment C, Section IV, (2)(b) and (c));
10. File on Inspection of a New Phosphogypsum Stack System (Attachment C, Section V (4));
11. Annual Contingency Plan and Training Plan (Attachment C, Section VIII (1) and (2));
.12. Replacement of Monitoring Device within Sixty (60) Days of Notification to EPA (Attachment D, Section VI (3));
13. Documentation Demonstrating the Continued Safety and Stability of the Dike (Attachment E, Section II (1));
14. Expansion Stack 5A alternative liner (Consent Decree ¶ 22(a)(3));
15. Submission of Report of Critical Condition and Proposal for Correction (Attachment E, Section I (1) and Section III (1));
19. Final Construction Quality Assurance Report (Attachment D, Section III (8));
20. Remedial EDI Plan (Attachment E, Section IV (4)); and
21. Corrective Action Work Implementation Plan (Attachment

A(18)(a)(ii)(2)).

22.    Submission of a RECAP Evaluation (Attachment B, Section IV); and

23.    New Phosphogypsum Stack System or Lateral Expansion designed with an appropriate safety factor (Attachment C, Section VI, (4).

32.    <u>Correction of Non-Compliance at the Uncle Sam Facility.</u>

(a)    If Mosaic determines, with or without notice from EPA and/or LDEQ, that it is violating, or will violate, any requirement of Section V (Compliance Requirements) of this Consent Decree, other than those set forth in Paragraphs 15(f) (temporary storage of First Saleable Product) and 25 (Financial Assurance obligations governed by Appendix 2 (Financial Assurance)), Mosaic shall submit with its report of the violation, pursuant to Section VIII (Reporting Requirements) of this Consent Decree, and shall subsequently implement, a correction plan to rectify the violation (Correction Plan), if it has not already corrected the violation by the time of the report.  The Correction Plan shall include a schedule for correcting the violation.

(b)    In the event of a violation subject to Paragraph 32(a), Mosaic shall be considered to be in compliance with this Consent Decree for purposes of: (1) continuing to manage wastes that Paragraphs 15 through 18 allow to be input to Upstream Operations or Downstream Operations or managed in BHT Recovery Units or together with Bevill-Exempt Wastes; and (2) assessing Mosaic's compliance with this Consent Decree under Paragraphs 34, 85, 86 and 87 of this Consent Decree, provided that:

(1)    Mosaic deposits wastes governed by Paragraphs 15-18 only in a Phosphogypsum Stack System subject to the Stack System Requirements set forth in Paragraph 15(a); and

(2)    Mosaic:

(i).    Timely implements and completes its Correction Plan; or

(ii).    Refers an allegation of non-compliance with Section V (Work

Requirements) or with a Correction Plan to dispute resolution pursuant to

Section XI (Dispute Resolution) and either

a.    Prevails in the dispute resolution or

b.    Satisfactorily complies with an EPA or judicial directive to correct

any instances of non-compliance

(collectively, Continuing Compliance Criteria).  Nothing in this Paragraph shall be construed as

EPA approval of Mosaic's correction efforts pursuant to this Paragraph, as a waiver of stipulated

penalties for the violation pursuant to Section IX (Stipulated Penalties), or as limiting the rights

reserved by Plaintiffs under Section VI (Work Takeover) or Paragraph 88 of this Consent

Decree.  EPA reserves the right to require, upon written request that a Correction Plan be

submitted to EPA for approval in accordance with Paragraphs 27 - 31, above.  Mosaic's

compliance with this Paragraph is without prejudice to its rights under Section X (Force

Majeure) and Section XI (Dispute Resolution) of this Consent Decree.

33.    Permits.  Where any compliance obligation under this Section requires Mosaic to

obtain a federal, Louisiana, or local permit, or other form of approval, Mosaic shall submit

timely and complete applications and take such actions as are necessary to obtain all such

permits or approvals.  A request for supplementation by the permitting agency does not

constitute a notice or finding that an application was incomplete for the purpose of this

Paragraph unless the permitting agency determines that the original application was so deficient

as to constitute a material breach of Mosaic's obligations under this Consent Decree.   Mosaic

may seek relief under the provisions of Section X (Force Majeure) of this Consent Decree for

any delay in the performance of any such obligation resulting from a failure to obtain, or a delay

41

in obtaining, any permit or approval required to fulfill such obligation, if Mosaic has submitted

timely and complete applications and has taken such actions as are necessary to timely obtain all

such permits or approvals.

34.     Provided that Mosaic remains in compliance with Section V (Compliance

Requirements) or the Continuing Compliance Criteria set forth in Paragraph 32 at the Uncle Sam

Facility, that Facility shall not be required to operate as a Treatment Storage and Disposal

Facility pursuant to Section 3005 of RCRA and its implementing federal and/or Louisiana

regulations, with respect to:

          (a)     the treatment, storage, transport, management, and disposal of Bevill-

Exempt  Wastes that have been commingled with hazardous wastes or otherwise managed in

violation of law as alleged in the Complaint,

                  (i)     prior to the lodging of this Consent Decree,

                  (ii)    prior to completing the compliance projects set forth in Appendix 6

          (RCRA Project Narrative and Compliance Schedule) as provided by Paragraph 13, or

                  (iii)   during timely implementation of a Correction Plan as set forth in

          Paragraph 32; and

          (b)     wastes that Paragraphs 15 through 18 allow to be input to Upstream

Operations or Downstream Operations or managed in BHT Recovery Units or together with

Bevill-Exempt Wastes.

## VI.  WORK TAKEOVER

35.     In the event EPA determines that Mosaic has:  (a) ceased implementation of any

portion of the Work; or (b) is seriously or repeatedly deficient or late in its performance of the

Work; or (c) is implementing the Work in a manner that may cause an endangerment to human

health or the environment, EPA, after consultation with LDEQ and with the joint approval of the

EPA Region 6 Regional Administrator and the Assistant Administrator for the EPA Office of

Enforcement and Compliance Assurance, may issue a written notice (Work Takeover Notice) to

Mosaic.  Any Work Takeover Notice issued by EPA shall specify the grounds upon which such

notice was issued and shall provide Mosaic a period of thirty (30) Days within which to remedy

the circumstances giving rise to EPA's issuance of such notice.

36.     If, after expiration of the thirty (30) Day period specified in Paragraph 35 of this

Section, the Work Takeover Notice has not been withdrawn by EPA and Mosaic has not

remedied to EPA's satisfaction the conditions giving rise to EPA's issuance of the Work

Takeover Notice, EPA at any time thereafter may undertake Work Takeover by assuming and/or

directing the performance of, or seeking the appointment of a receiver to direct the performance

of all or any Work that EPA deems necessary to correct the violations or conditions that

triggered the Work Takeover Notice pursuant to Paragraph 35 (Work Takeover).  In either case,

and only with the concurrence of LDEQ, EPA may utilize Financial Assurance for

Phosphogypsum Stack System Closure, Long-Term Care, and/or Corrective action as authorized

by this Consent Decree to correct the violations or conditions that triggered the Work Takeover

Notice. EPA shall notify Mosaic in writing (which writing may be electronic) if EPA determines

that implementation of a Work Takeover is warranted under this Section of the Consent Decree.

In the event that EPA seeks to appoint a receiver to direct the performance of the Work, Mosaic

shall not oppose such appointment on grounds other than lack of competence or conflict of

interest, but shall retain its right to challenge the underlying Work Takeover in Dispute

Resolution, as set forth in the following Paragraph and Section XI (Dispute Resolution) of this

Consent Decree.  In implementing any Work Takeover, EPA shall make reasonable efforts not to

interfere with Facility operations not directly affected by the conditions that triggered the Work Takeover.

37.     In the event that Mosaic invokes Section XI (Dispute Resolution) of this Consent Decree with respect to EPA's Work Takeover and/or its selection of options set forth in Paragraph 36 (which must be disputed together with the underlying Work Takeover and pursuant to Paragraph 76(a) of this Consent Decree), EPA during the pendency of any such dispute may, in its unreviewable discretion, commence and continue a Work Takeover until the earlier of: (a) the date that Mosaic remedies, to EPA's satisfaction, the circumstances giving rise to issuance of the Work Takeover Notice; or (b) the date that a final decision is rendered in accordance with Section XI (Dispute Resolution) of the Consent Decree requiring EPA to terminate such Work Takeover.

38.     After commencement and for the duration of any Work Takeover, EPA or any appointed receiver shall have the immediate benefit of any Financial Assurance provided pursuant to Paragraph 25 of this Consent Decree and Appendix 2 to implement the Work.  If EPA or any appointed receiver are unable to access the Financial Assurance, or the Work addressed by the Work Takeover is not covered by Financial Assurance, then any unreimbursed costs incurred by EPA in connection with the Work Takeover shall be considered a financial obligation owed by Mosaic to the United States and collectible in an action to enforce this Consent Decree.  Nothing in this Paragraph shall be construed to relieve Mosaic of its obligation to provide adequate Financial Assurance pursuant to Appendix 2.  In the event that it is determined in Dispute Resolution that the Work Takeover was not warranted, any unexpended funds in a Stand-by Trust that originated from a letter of credit or surety bond shall be used to restore any pre-existing Trust Fund to the pre-Work Takeover level, if necessary, and any

balance of unexpended funds shall be released and used to re-establish the original financial mechanism(s).

## VII.  BENEFICIAL ENVIRONMENTAL PROJECTS

39.     Within thirty (30) Days after the Effective Date of the Consent Decree, Mosaic shall deposit $1,000,000.00 into an escrow account established and administered by LDEQ, in accordance with instructions that will be provided by LDEQ within sixty (60) Days of the lodging of this Consent Decree, for the purpose of LDEQ's conducting the beneficial environmental projects (BEPs) identified in this Section.  After January 1, 2020, any funds that remain in this escrow account and that have not been committed to the BEPs identified in this Section will be transferred by LDEQ to the Louisiana Hazardous Waste Clean-Up Fund.

40.     Minerals Toxicity Study and Mineral Criteria Assessment BEP.  LDEQ will assess statewide water quality criteria/standards for minerals (e.g., chlorides, sulfates) based upon a thorough review of scientific literature, data from aquatic toxicity tests, and a review of criteria/standards from other states and jurisdictions.  BEP funding will be utilized in conducting aquatic toxicity testing that will be utilized in establishing a statewide formula for the development of mineral criteria and/or standards protective of waters of the State.  The results of these studies will provide data that may be used by Louisiana to help develop or refine state mineral related standards.

41.     Minerals Toxicity Study and Mineral Criteria Assessment BEP Objectives. The objectives for the BEP referenced in Paragraph 40 are to: (1) Develop a study, including acute and chronic toxicity tests, on representative Louisiana species across a range of hardness values (including low hardness waters) typical of Louisiana; and (2) Conduct toxicity studies to determine acute and chronic effects to calculate ratios and/or genus mean acute values that can

be used to help develop State standards for chlorides, sulfates, and/or other appropriate minerals criteria.

42.     <u>Producer-Specific Watershed Nutrient Management Plans BEP</u>.  LDEQ, in coordination with the Louisiana State University Agricultural Center, will develop producer-specific master programs and Watershed Nutrient Management Plans (collectively WNMP) to be utilized by beef cattle, dairy, and poultry producers for the purpose of reducing pollution, such as excess nutrients, into the environment through improved farm practices specific to producer needs.  These WNMPs will enhance the Comprehensive Nutrient Management Plans that are available from the United States Department of Agriculture (USDA) by incorporating complementary activities for nutrient management, such as operation and maintenance, tracking, monitoring, and beneficial use.

43.     <u>Producer-Specific Watershed Nutrient Management Plans BEP Objectives</u>.  The objectives for the BEP referenced in Paragraph 42 are to: (1) Develop WNMPs to address nutrients, potentially including the completion of an environmental needs assessment to identify the water quality issues for a watershed; and (2) Develop WNMPs for the identified producer-specific commodities in targeted watersheds.

44.     Mosaic's funding of the escrow account shall not be construed as an endorsement of, and Mosaic reserves all rights to dispute, any methodologies, analyses, conclusions or findings resulting from the BEPs described above.

45.     If Defendant fails to deposit funds in the escrow account in accordance with Paragraph 39, stipulated penalties may be assessed under Section IX (Stipulated Penalties).

## VIII. REPORTING REQUIREMENTS

46.     If Mosaic determines that it has violated or will violate, any requirement of this

Consent Decree, Mosaic shall notify EPA and LDEQ of such violation and its likely duration, in

writing (unless otherwise directed by EPA or LDEQ), within twelve (12) Days of the date

Mosaic first becomes aware of the violation, with an explanation of the likely cause of the

violation and of the remedial steps taken, or to be taken, to prevent or minimize such violation.

If the cause of a violation cannot be fully explained at the time the report is due, Mosaic shall so

state in the report.  Mosaic shall investigate the cause of the violation and shall then submit an

amendment to the report, including a full explanation of any identifiable cause(s) of the

violation, within thirty (30) Days of the date Mosaic becomes aware of the violation.  Nothing in

this Paragraph or Paragraphs 47 and 48 relieves Mosaic of its obligation to provide the notice

required by Section X of this Consent Decree (Force Majeure).

47.     <u>Periodic Reporting</u>.

(a)     <u>Uncle Sam</u>. On or before the 15th day of the second month following the end of

each calendar-quarter after lodging of this Consent Decree (quarters shall be calculated based on

Mosaic's December 31st end-of-fiscal-year), until the quarter ending after the completion of all

the projects listed in Appendix 6 (RCRA Narrative and Compliance Schedule) for the Uncle Sam

Facility , Mosaic shall submit to EPA and LDEQ a report for the Uncle Sam Facility for the

preceding calendar quarter that shall include (i) the status of any construction or compliance

measures described in Appendix 6; (ii) completion of milestones set forth in Appendix 6;

(iii) problems encountered or anticipated, together with implemented or proposed solutions, with

projects described in Appendix 6; (iv) status of permit applications for projects described in

Appendix 6; (v) status of plans for closure and long-term care and status of permit application, as

applicable, for closure or long-term care; (vi) operation and maintenance difficulties or concerns relating to compliance with Paragraphs 15 and 17 - 18; (vii) status of Financial Assurance; (viii) a description of any violation of the requirements of this Consent Decree reported under Paragraph 46 and an explanation of the likely cause of such violation and of the remedial steps taken, or to be taken, to prevent or minimize such violation; (ix) the log of any temporary use of units in Upstream Operations, Mixed-Use Units or Grandfathered Units for the storage of the First Saleable Product; (x) the log of spills and leaks tracked pursuant to the BMP set forth in Appendix 5; and (xi) identification of any confirmed "critical condition" as defined and reported to LDEQ and/or EPA pursuant to Appendix 1.  Thereafter, and for a period of two (2) years, Mosaic shall submit such reports to EPA and LDEQ on a semi-annual basis.  Thereafter, Mosaic shall submit such reports annually until such time as Mosaic submits the Uncle Sam Closure Application pursuant to Appendix 1, Attachments D (Closure of Phosphogypsum Stacks/Stack Systems) and G (Phosphogypsum Stack System Closure Application).  Mosaic shall submit its next report within one-hundred-eighty (180) Days after the submission of the Uncle Sam Closure Application, and annually thereafter until this Consent Decree is terminated with respect to the Uncle Sam Facility.

(b)     Faustina.  On or before the 15th day of the second month following the end of each calendar-quarter after lodging of this Consent Decree (quarters shall be calculated based on Mosaic's December 31st end-of-fiscal-year), until the quarter ending after the completion of Projects 1 - 5, 7 - 8, and 10 listed in Appendix 6 (RCRA Narrative and Compliance Schedule) for the Faustina Facility, Mosaic shall submit to EPA and LDEQ a report for the Faustina Facility for the preceding calendar quarter that shall include (i) the status of any construction or compliance measures described in Appendix 6; (ii) completion of milestones set forth in

Appendix 6; (iii) problems encountered or anticipated, together with implemented or proposed solutions, with projects described in Appendix 6; (iv) status of permit applications for projects described in Appendix 6; (v) status of plans for long-term care and status of permit application, as applicable, for closure or long-term care; (vi) operation and maintenance difficulties or concerns relating to compliance with Paragraph 16; (vii status of Financial Assurance; (viii) a description of any violation of the requirements of this Consent Decree reported under Paragraph 46 and an explanation of the likely cause of such violation and of the remedial steps taken, or to be taken, to prevent or minimize such violation; and (ix) any notification or reporting pursuant to 40 CFR 265.196(d) or LAC 33:V.1913.D, as set forth in Project 6 in Appendix 6 (RCRA Narrative and Compliance Schedule) for the Faustina Facility.  Thereafter, Mosaic shall submit such reports annually until this Consent Decree is terminated with respect to the Faustina Facility.

48.     Whenever any violation of this Consent Decree, or any other event affecting Mosaic's performance under this Consent Decree or the performance of its Facility, may pose an immediate threat to the public health or welfare or the environment, Mosaic shall, unless otherwise directed, notify EPA and LDEQ in Section XV (Notices) orally or by electronic or facsimile transmission as soon as possible, but no later than twenty-four (24) hours after Mosaic first knew of the event, and shall comply with the requirements of Appendix 1, Attachment E (Critical Conditions and Temporary Measures).  Any violation of this notice requirement shall be deemed to terminate on the Day that both EPA and LDEQ have received actual notice of the violation or event from Mosaic or by other means. This notice requirement does not relieve Mosaic of its obligation to comply with any federal and state laws applicable to the violation or

event.  This notice requirement is in addition to the requirement to provide notice of a violation

of this Consent Decree set forth in Paragraph 46.

49.      All notices and submittals to "EPA and/or LDEQ" under this Consent Decree

(including Appendices), other than those required by this Section or that are submitted for

approval pursuant to Paragraphs 27-31, may be submitted to LDEQ only, provided that a copy of

the cover letter identifying the notice or submittal is also sent to EPA.  Mosaic also shall supply

EPA with a copy of such notice(s) or submittal(s) upon request by EPA.

50.      Each report submitted by Mosaic under this Section shall be signed by a

responsible corporate official of Mosaic (as defined in 40 C.F.R. § 270.11(a)) and shall include

the following certification:

> I certify under penalty of law that this document and all attachments
> were prepared under my direction or supervision in accordance with
> a system designed to assure that qualified personnel properly gather
> and evaluate the information submitted. Based on my inquiry of the
> person or persons who manage the system, or those persons directly
> responsible for gathering the information, the information submitted
> is, to the best of my knowledge and belief, true, accurate, and
> complete. I am aware that there are significant penalties for
> submitting false information, including the possibility of fine and
> imprisonment for knowing violations.

This certification requirement does not apply to emergency notifications where compliance

would be impractical.

51.      The reporting requirements of this Consent Decree do not relieve Mosaic of any

reporting obligations required by the RCRA Requirements, or by any other federal, Louisiana, or

local law, regulation, permit, or other requirement.  However, the reporting requirements of this

Consent Decree shall not require Mosaic to re-submit any report, plan or information submitted

by Mosaic to EPA and/or LDEQ prior to the Effective Date of this Consent Decree.

52.     Any information provided pursuant to this Consent Decree may be used by the Plaintiffs in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## IX.  STIPULATED PENALTIES

53.     Mosaic shall be liable for stipulated penalties to the United States and LDEQ for violations of this Consent Decree as specified below, unless excused under Section X (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

54.     <u>Civil Penalty and BEPs</u>. If Mosaic fails to pay the civil penalty and/or fails to submit payment to an escrow account for the BEPs, as required under Sections IV (Civil Penalty) and VII (Beneficial Environmental Projects) of this Consent Decree when due, Mosaic shall pay a stipulated penalty of $1,000 per Day for each Day that the payment is late for the first ten (10) Days, together with Interest.  Thereafter, Mosaic shall pay $3,000 per Day for each Day that the payment is late, with Interest.  Late payment of the federal civil penalty shall be made in accordance with Section IV (Civil Penalty), Paragraph 10, and late payment of the Louisiana penalty and/or BEP funding shall be made in accordance with Section IV (Civil Penalty), Paragraph 11.  Stipulated penalties for late payment of the civil penalty or BEP shall be paid in accordance with Paragraphs 58 - 64, below.  All transmittal correspondence shall state that any such payment is for late payment of the civil penalty or BEP due under this Consent Decree, or for stipulated penalties for late payment, as applicable, and shall include the identifying information set forth in Paragraphs 10 or 11, above as applicable.

55.    <u>Compliance Requirements</u>.  The following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Section V (Compliance Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 14th Day |
| $2,000 | 15th through 30th Day |
| $3,000 | 31st Day and beyond |

(a)    <u>Uncle Sam Facility</u>. Stipulated penalties shall not apply to spills and leaks that are successfully managed in compliance with the approved BMP set forth in Appendix 5.

56.    <u>Reporting Requirements</u>.  The following stipulated penalties shall accrue per violation per Day for each violation of the requirements of Section VIII of this Consent Decree (Reporting Requirements):

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $ 750 | 1st through 14th Day |
| $1,000 | 15th through 30th Day |
| $2,000 | 31st Day and beyond |

57.    Subject to the provisions of Paragraph 30(c), above, and except as otherwise specified in Paragraphs 30(c) and 65(b), stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

58.     Mosaic shall pay stipulated penalties to the United States and to LDEQ within twelve (12) Days of a written demand by either Plaintiff, subject to its right to invoke dispute resolution in accordance with Section XI (Dispute Resolution).  Except as provided in Paragraph 45, Mosaic shall pay fifty percent (50%) of the total stipulated penalty amount due to the United States and fifty percent (50%) to LDEQ.  The Plaintiff making a demand for payment of a stipulated penalty shall simultaneously send a copy of the demand to the other Plaintiff.

59.     Each Plaintiff, may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due to it under this Consent Decree.  The determination by one Plaintiff not to seek stipulated penalties, or to subsequently waive or reduce the amount it seeks, shall not preclude the other Plaintiff from seeking the full amount of the stipulated penalties owed.

60.     Stipulated penalties shall continue to accrue as provided in Paragraph 57, during any Dispute Resolution, but need not be paid until the following:

(a)     If the dispute is resolved by agreement or by a decision of the United States or LDEQ that is not subject to judicial review or appealed to the Court, Mosaic shall pay accrued penalties determined to be owing, together with Interest, to the United States or LDEQ within thirty (30) Days of the effective date of the agreement or the receipt of the United States' or LDEQ's decision or order.

(b)     If the dispute is appealed to the Court and the United States or LDEQ prevails in whole or in part, Mosaic shall pay all accrued penalties determined by the Court to be owing, together with Interest, within sixty (60) Days of receiving the final Court decision.

61.     Mosaic shall pay stipulated penalties owing to the United States in the manner set forth and with the confirmation notices required by Paragraph 10, except that the transmittal

letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid. Mosaic shall pay stipulated penalties owing to LDEQ in accordance with Paragraph 11, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

62.     Mosaic shall not deduct stipulated penalties paid under this Section in calculating its Louisiana and federal income tax.

63.     If Mosaic fails to pay stipulated penalties according to the terms of this Consent Decree, Mosaic shall be liable for Interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due. Nothing in this Paragraph shall be construed to limit the United States or LDEQ from seeking any remedy otherwise provided by law for Mosaic's failure to pay any stipulated penalties.

64.     Subject to the provisions of Section XIII (Effect of Settlement/ Reservation of Rights) of this Consent Decree, the stipulated penalties provided for in this Consent Decree shall be in addition to any other rights, remedies, or sanctions available to the United States or LDEQ for Mosaic's violation of this Consent Decree or applicable law. Where a violation of this Consent Decree is also a violation of relevant statutory or regulatory requirements, Mosaic shall be allowed a credit for any stipulated penalties paid against any statutory penalties imposed for such violation.

## X. FORCE MAJEURE

65.     Force majeure, for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Mosaic, of any entity controlled by Mosaic, or of Mosaic's contractors that delays or prevents the performance of any obligation under this Consent Decree despite Mosaic's best efforts to fulfill the obligation. The requirement that

Mosaic exercise best efforts to fulfill the obligation includes using best efforts to anticipate any

potential force majeure and best efforts to address the effects of any potential force majeure

(1) as it is occurring and (2) following the potential force majeure such that the delay and any

adverse effects of the delay are minimized to the greatest extent possible.  Force majeure does

not include Mosaic's financial inability to perform any obligation under this Consent Decree.

66.      If any event occurs or has occurred that may delay the performance of any

obligation under this Consent Decree, whether or not caused by a force majeure event, Mosaic

shall provide notice orally or by electronic or facsimile transmission as soon as possible, as

provided in Section XV (Notices) of this Consent Decree to EPA and LDEQ, but not later than

seven (7) Days after the time when Mosaic first knew that the event might cause a delay.  Within

ten (10) Days thereafter, Mosaic shall provide written notice to EPA and LDEQ with an

explanation and description of the reasons for the delay; the anticipated duration of the delay;

all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation

of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Mosaic's

rationale for attributing such delay to a force majeure event if it intends to assert such a claim;

and a statement as to whether, in the opinion of Mosaic, such event may cause or contribute to an

endangerment to public health, welfare or the environment.  Mosaic shall include with any notice

all available documentation supporting a claim that the delay was attributable to a force majeure

event.  Mosaic shall be deemed to know of any circumstance of which Mosaic, any entity

controlled by Mosaic, or Mosaic's contractors knew or reasonably should have known.  Failure

to comply with the above requirements regarding an event shall preclude Mosaic from asserting

any claim of force majeure regarding that event, provided, however, that if EPA, despite the late

notice, is able to assess to its satisfaction whether the event is a force majeure under Paragraph

65 and whether Mosaic has exercised its best efforts under Paragraph 65, EPA may, in its unreviewable discretion, excuse in writing Mosaic's failure to submit timely notices under this Paragraph.

67.     If EPA, after consultation with LDEQ, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after consultation with LDEQ, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.  If EPA, after consultation with LDEQ, agrees that the delay is attributable to a force majeure event, EPA will notify Mosaic in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event.

68.     If EPA, after consultation with LDEQ does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Mosaic in writing of its decision.

69.     If Mosaic elects to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of EPA's notice.  In any such proceeding, Mosaic shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Mosaic complied with the requirements of Paragraphs 65 and 66,

above.  If Mosaic carries this burden, the delay at issue shall not constitute a violation by Mosaic of the affected obligation of this Consent Decree identified to EPA and the Court.

## XI.  DISPUTE RESOLUTION

70.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve all disputes arising under or with respect to this Consent Decree.  Mosaic's failure to seek resolution of a disputed issue under this Section shall preclude Mosaic from raising any such issue as a defense to an action by the United States or LDEQ to enforce any obligation of Mosaic arising under this Consent Decree.

71.    <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations, which may include any third-party assisted, non-binding alternative dispute resolution process agreeable to the Parties. Mosaic shall submit a written Notice of Dispute to both the United States and LDEQ within thirty (30) Days after receiving written notice from EPA of a decision that Mosaic disputes. The dispute shall be considered to have arisen on the later of the dates that the United States or LDEQ receives a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed twenty (20) Days from the date that the dispute arises, unless that period is modified by written agreement between the United States and Mosaic.  If the Parties cannot resolve a dispute by informal negotiations, then the position of EPA, after consultation with LDEQ, shall be considered binding, unless Mosaic invokes formal dispute resolution procedures as provided in the following Paragraph.

72.    <u>Formal Dispute Resolution</u>.  If Mosaic elects to invoke formal dispute resolution, Mosaic shall, within thirty (30) Days after the conclusion of the informal negotiation period,

submit to EPA and LDEQ a written Statement of Position regarding the matter in dispute. The

Statement of Position shall include, but need not be limited to, any factual data, analysis, or

opinion supporting Mosaic's position and any supporting documentation relied upon by Mosaic.

73.      EPA, after consultation with LDEQ, shall submit its Statement of Position within

forty-five (45) Days of receipt of Mosaic's Statement of Position.  The EPA Statement of

Position shall include or clearly reference, but need not be limited to, any factual data, analysis,

or opinion supporting that position and any supporting documentation relied upon by EPA.

Where appropriate, EPA may allow submission of supplemental statements of position by the

Parties to the dispute.  The EPA Statement of Position shall be binding on Mosaic unless Mosaic

files a motion for judicial review of the dispute in accordance with the following Paragraph.

74.      Unless expressly stated otherwise in this Consent Decree, Mosaic may seek

judicial review of the dispute by filing with the Court and serving on the United States and

LDEQ, in accordance with Section XV (Notices) of this Consent Decree, a motion requesting

judicial resolution of the dispute.  The motion must be filed within thirty (30) Days of receipt of

the EPA Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a

written statement of Mosaic's position on the matter in dispute, including any supporting factual

data, analysis, opinion, or documentation, and shall set forth the relief requested and any

schedule within which the dispute must be resolved for orderly implementation of the Consent

Decree.

75.      The United States, after consultation with LDEQ, shall respond to Mosaic's

motion within the time period allowed by the Local Rules of this Court.  Mosaic may file a reply

memorandum, to the extent permitted by the Local Rules.

76.    <u>Standard of Review</u>.

(a)    <u>Disputes Concerning Matters Accorded Record Review</u>.  In any dispute brought under this Section pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the Work performed pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, EPA shall compile an administrative record of the dispute containing all Statements of Position, including supporting documentation and referenced data or information, and Mosaic shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

(b)   In any other dispute brought under this Section, Mosaic shall bear the burden of demonstrating that its position complies with and furthers the objectives of this Consent Decree.

77.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Mosaic under this Consent Decree, unless and until final resolution of the dispute so provides or unless ordered by the Court.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 72.  If Mosaic does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XII. INFORMATION COLLECTION AND RETENTION

78.     The United States, LDEQ, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any of Mosaic's Louisiana Facilities, at all reasonable times, upon presentation of appropriate identification, to:

(a)  monitor the progress of activities required under this Consent Decree;

(b)  verify any data or information submitted to the United States or LDEQ in accordance with the terms of this Consent Decree;

(c)  obtain samples and, upon request, splits of any samples taken by Mosaic or its representatives, contractors, or consultants;

(d)  obtain documentary evidence, including photographs and similar data;

(e)  assess Mosaic's compliance with this Consent Decree; and

(f)  conduct, direct or review Work pursuant to Section VI (Work Takeover) of this Consent Decree.

79.     Upon request, Mosaic shall provide EPA, LDEQ and their authorized representatives splits of any samples taken by Mosaic.  Upon request, EPA and LDEQ shall provide Mosaic splits of any samples taken by EPA, LDEQ, and their authorized representatives.

80.     Mosaic shall retain, and shall require its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, emails or other information in electronic form and including any documents, records, data or other information underlying the submission of any Report required pursuant to Section VIII (Reporting Requirements)) in its or its contractors or agents possession or control, or that come into its or its contractors' or agents' possession or control and that relate to Mosaic's performance of its obligations under this Consent Decree or adherence to the requirements

associated with the management of waste materials allowed under Paragraphs 15 through 18 for

a period of five (5) years after the creation of such documents, records or other information.

This information-retention requirement shall apply regardless of any contrary corporate or

institutional policies or procedures.  At any time during this information-retention period, upon

request by the United States or LDEQ, Mosaic shall provide copies of any documents, records,

or other information required to be maintained under this Paragraph.

      81.     At the conclusion of the information-retention period provided in the preceding

Paragraph, Mosaic shall notify the United States and LDEQ at least ninety (90) Days prior to

Mosaic's destruction of any documents, records, or other information subject to the requirements

of the preceding Paragraph.  Unless otherwise directed by EPA, in consultation with LDEQ,

Mosaic shall require its contractors and agents to provide the same notice to Mosaic with respect

to their materials, and shall promptly relay any such notices to the United States and FDEP.

Upon request by the United States or LDEQ, Mosaic shall deliver any such documents, records,

or other information to EPA or LDEQ.  Mosaic shall not dispose of materials following the

expiration of its five (5) year retention period more often than once a year.

      82.     In connection with any request for documents, records, or other information

pursuant to this Consent Decree, Mosaic may assert that certain documents, records, or other

information are privileged under the attorney-client privilege or any other privilege recognized

by federal law, provided that Mosaic shall not assert a legal privilege for any data, records or

information (excluding legal advice) generated or received in connection with Mosaic's

obligations pursuant to the requirements of this Consent Decree.  If Mosaic asserts a privilege, it

shall provide the following:  (1) the title of the document, record, or information; (2) the date of

the document, record, or information; (3) the name and title of each author of the document,

record, or information; (4) the name and title of each addressee and recipient; (5) a description of

the subject of the document, record, or information; and (6) the privilege asserted by Mosaic.

If Plaintiffs and Mosaic disagree as to whether a particular document or record is privileged,

Mosaic shall deliver such document or record to the United States or LDEQ unless it invokes

dispute resolution pursuant to Section XI (Dispute Resolution), in which case, Mosaic shall not

have an obligation to deliver such document or record until a final determination is made,

pursuant to the procedures set forth in Section XI (Dispute Resolution), that such document or

record is not privileged.

83.    Mosaic may also assert that information provided pursuant to this Consent Decree

is protected as Confidential Business Information ("CBI") under the criteria and procedures set

forth in 40 C.F.R. Part 2 or LAC 33:I.Chapter 5, provided that: (a) Mosaic shall not assert a CBI

claim with respect to any physical, sampling, monitoring, or analytical data other than data

related to: (i) development of new or modified products; (ii) development of new or modified

production processes; (iii) production materials or analyses collected for quality control or other

manufacturing purposes; or (iv) analyses undertaken for competitive business purposes; and

(b) Mosaic shall not assert a CBI claim for Financial Assurance information required to be

provided pursuant to Paragraphs 10.e, 15(e) and 32 of Appendix 2 of this Consent Decree.

If Mosaic claims any information related to Financial Assurance submissions and Cost Estimates

is CBI, Mosaic shall submit two versions, one version with the CBI material redacted, and so

identified in the document, which will be publicly available, and the second version will contain

the CBI material.

84.    This Consent Decree in no way limits or affects any right of entry and inspection,

or any right to obtain information, held by the United States or LDEQ pursuant to applicable

federal or Louisiana laws, regulations, or permits, nor does it limit or affect any duty or obligation of Mosaic to maintain documents, records, or other information imposed by applicable federal or Louisiana laws, regulations, or permits.

## XIII. EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

85.     This Consent Decree resolves the civil claims of the United States and LDEQ against Mosaic and, as to liability arising out of Mosaic's liability only, The Mosaic Company for the violations at the Facilities alleged in the Complaint filed in this action through the date of the lodging of the Consent Decree.  This Consent Decree also resolves such claims, if any, of the United States and LDEQ against the corporate officers, directors, and employees, acting in their capacities as such, of Mosaic or The Mosaic Company, but only as to liability arising out of Mosaic's liability.  For continuing violations alleged in the Complaint, provided that Mosaic complies with this Consent Decree at a Facility, as set forth in Paragraph 87, from the date of lodging of the Consent Decree through its Effective Date, these claims shall also be resolved through the Effective Date of this Consent Decree, as of the Effective Date, for that Facility; and, provided that Mosaic complies with the Consent Decree at a Facility from the Effective Date of this Consent Decree through the date of termination of this Consent Decree for that Facility pursuant to Section XIX (Termination), these claims shall be finally resolved as of the date the Consent Decree terminates for that Facility.

86.     Provided that Mosaic is in compliance with this Consent Decree, and subject to the reservation below, Plaintiffs covenant not to sue or take administrative action, under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a) or a state law counterpart, seeking to require Mosaic's Facilities to comply with the RCRA Requirements, with respect to: (a) the generation, treatment, storage, transport, management, and disposal of Bevill-Exempt Wastes

that have been commingled with hazardous wastes or otherwise managed in violation of law as

alleged in the Complaint, and that are resolved in accordance with Paragraph 85; (b) wastes that

Paragraphs 15 through 18 of this Consent Decree allow to be input to Upstream Operations or

Downstream Operations or managed in BHT Recovery Units, IGPUs, GPUs, Granulation Sump

Ditches or with Bevill-Exempt Wastes; and (c) conditions addressed under Paragraphs 23

and 24.  Further, provided that Mosaic is in compliance with this Consent Decree, LDEQ

covenants not to sue or take administrative action seeking to require the Phosphogypsum Stack

System at Mosaic's Uncle Sam Facility to comply with otherwise applicable requirements of the

Louisiana Solid Waste Management and Resource Recovery Law (La. R.S. 30:2151 et seq.) and

the regulations promulgated thereunder (LAC 33:VII, Subpart 1).  (The interface of the

Louisiana Solid Waste Management and Resource Recovery Law (La. R.S. 30:2151 et seq.) and

the regulations promulgated thereunder (LAC 33:VII, Subpart 1) and Defendant's obligations

under this Consent Decree is further addressed in the letter from LDEQ dated September

29, 2015.)  Nothing in this Paragraph, however, shall affect Plaintiffs' rights to determine and

require necessary Corrective Action Work in accordance with Paragraphs 21 and 22(a)(1),

respectively, of this Consent Decree, or to restrict Non-CD Corrective Action that may be

required at a Facility pursuant to Plaintiffs' residual authorities under federal, state, and local

laws.

> 87.     The resolution under this Section XIII (Effect of Settlement/Reservation of

Rights) of the Plaintiffs' civil claims set forth in the Complaint and the Plaintiffs' covenants not

to sue are expressly conditioned upon Mosaic's timely and satisfactory compliance with the

requirements of this Consent Decree.  For the purposes of this Paragraph (and Paragraphs 85 and

86), and with respect to the wastes that Paragraphs 15 through 18 allow to be input to Upstream

Operations or Downstream Operations, managed in BHT Recovery Units, IGPUs, GPUs, Granulation Sump Ditches, or with Bevill-Exempt Wastes, compliance with the Continuing Compliance Criteria set forth in Paragraph 32 constitutes compliance with this Consent Decree.

88.     The United States and LDEQ reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, and Mosaic reserves all legal and equitable defenses available to it in the defense of any such enforcement.  This Consent Decree shall not be construed to limit the rights of the United States or LDEQ to obtain penalties or injunctive relief under the federal and Louisiana environmental statutes or their implementing regulations, or under other federal or Louisiana law regulations or permit conditions, including Section 3008(h) of RCRA, 42 U.S.C. § 6928(h), except as expressly specified in Paragraphs 85 and 86, and Mosaic in any such action shall not assert any defense based upon the contention that such claims raised by the Plaintiffs were or should have been brought in the instant case under principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other such defenses.  The United States and LDEQ further retain all authority and reserve all rights to take any and all actions authorized by law to protect human health and the environment, including Corrective Action Work and Non-CD Corrective Action, and all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, Mosaic's Facilities, whether related to the violations addressed in this Consent Decree or otherwise.

89.     This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local law or regulation.  While this Consent Decree resolves the Parties' dispute regarding the violations alleged in the Complaint as set forth in Paragraph 85, compliance with the terms of this Consent Decree does not guarantee compliance with all applicable federal,

State, or local laws or regulations.  Except as provided in Paragraphs 34, 85, and 86 of this Consent Decree, Mosaic is not relieved of its obligation to achieve and maintain compliance with all applicable federal, State, and local laws, regulations, and permits; Mosaic's compliance with this Consent Decree shall be no defense to any action commenced by Plaintiffs pursuant to any such law, regulation, or permit, except as expressly specified in Paragraphs 34, 85 and 86.

90.     This Consent Decree does not limit or affect the rights of the Parties against any third-parties (persons not a Party to this Consent Decree), nor does it limit the rights of third-parties except as otherwise provided by the doctrine of federal preemption or by other applicable principles of law or precedent.

91.     This Consent Decree shall not be construed to create rights or obligations in, or grant any cause of action to, any third-party.

92.     Nothing in the Complaint filed in this action or in this Consent Decree, including the execution and implementation of this Consent Decree, shall constitute an admission by Mosaic of any violation of the RCRA Requirements or of any of the allegations of the Complaint.  Mosaic reserves all rights to dispute the factual and legal representations of the Complaint and Consent Decree except in an action to enforce this Consent Decree by a Party. The terms of this Consent Decree may not be used as evidence in any litigation between the Parties except (a) pursuant to Section XI (Dispute Resolution), (b) in an action to enforce this Consent Decree, or (c) in an action by Plaintiffs in which Mosaic asserts a defense based on this Consent Decree.

## XIV. COSTS

93.     The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and LDEQ shall be entitled to collect costs (including attorneys'

fees) incurred in any action necessary to access Financial Assurance pursuant to Paragraph 25 and Appendix 2 (Financial Assurance) of this Consent Decree, or to collect any portion of the civil penalty or any stipulated penalties or other costs due under this Consent Decree but not paid by Mosaic.

94.   <u>LDEQ Costs Incurred in Oversight of Consent Decree</u>.

(a)   LDEQ may employ, arrange for, or contract with a qualified person to perform oversight tasks related to the Work performed under this Consent Decree.  Mosaic shall bear reasonable and necessary costs incurred by LDEQ for oversight related to the Work performed under this Consent Decree following the Entry Date and as allowed by law.  Following the first anniversary of this Consent Decree, LDEQ may propose to increase the Annual Oversight Cost Cap on an annual basis to reflect cost increases; provided, however, such proposed increase shall not exceed the current inflationary rate for the specific year.

(b)   LDEQ shall keep accurate books and accounts of oversight costs.  Such books and accounts may be audited by Mosaic upon written request.  Annually from the Effective Date of this Consent Decree, or at the end of each calendar-quarter if deemed appropriate by LDEQ, LDEQ shall submit to Mosaic an invoice for oversight costs that LDEQ asserts are recoverable under Paragraph 94(a).  The invoice shall describe for each person and for each day the oversight work for which LDEQ seeks reimbursement in sufficient detail to document the amount of time spent on oversight work and to describe the oversight work performed during the time documented.  If Mosaic disagrees with this invoice on the basis that costs incurred by LDEQ are not reasonable, not necessary, or excessive or the invoice fails to provide sufficient information as described above, then Mosaic may invoke Section XI (Dispute Resolution) of this Consent Decree.  Mosaic shall, within sixty (60) calendar Days of receiving

the invoice, unless it has invoked Section XI (Dispute Resolution) before this 60  Day period has

passed, remit a check or electronic payment for the amount of those costs made payable to the

Louisiana Department of Environmental Quality.  Checks shall specifically reference the Facility

and invoice number, and be mailed to the following address:

> Accountant Administrator
> Financial Services Division
> Office of Management and Finance
> Louisiana Department of Environmental Quality
> P.O. Box 4303
> Baton Rouge, LA  70821-4303

Electronic Payments shall specifically reference the Facility and invoice number and can be made
to the following:

> Bank Name:          JP Morgan Chase
> Account Name:     State of Louisiana, Dept. of Environmental Quality
> Routing:               XXXXXX021 (ACH) or
>                             XXXXXX137 (Fed Wire)
> Account Number:  XXXXX544

A copy of the check or payment confirmation and transmittal letter shall be mailed to:

> Cost Recovery Officer
> Office of Environmental Compliance
> Remediation Services Division
> Louisiana Department of Environmental Quality
> P.O. Box 4314
> Baton Rouge, LA  70821-4314

This Paragraph shall not prejudice LDEQ's right to bring an action against any party, including

Mosaic, under the Comprehensive Environmental Response, Compensation, and Recovery Act

(CERCLA) for recovery of any future costs incurred by LDEQ related to this Consent Decree and

not reimbursed by Mosaic.

**Mosaic Consent Decree – EPA Region 6 and LDEQ**

## XV. NOTICES

95.     Unless otherwise specified in this Consent Decree, whenever notifications,

submissions, or communications are required by this Consent Decree in accordance with Section

VIII (Reporting Requirements) they shall be made electronically, unless otherwise requested by

either LDEQ or EPA, and addressed as follows:


To the United States:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Re: DOJ No. 90-7-1-[08388]

To Deborah Reyher (or a successor identified by DOJ in writing):

*via email:*
Deborah.Reyher@usdoj.gov

*via facsimile*:
(202) 616-6584
*via regular mail or post office express mail*:
Box 7611 Ben Franklin Station
Washington, D.C. 20044-7611

*via private overnight service*:
601 D Street, NW, 2nd Floor
Washington, D.C. 20004


and to EPA, below.

To EPA:
Associate Director
Hazardous Waste Enforcement Branch
U.S. Environmental Protection Agency,
Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX 75202-2733
Phone: (214) 665-6746
Fax: (214) 665-2182

Van Housman and Bethany Russell (or successors identified by EPA in writing)
Office of Civil Enforcement
Mail Code 2249A
U.S. Environmental Protection Agency
Clinton Building-South
1200 Pennsylvania Ave., NW
Washington, D.C. 20460
Phone: (202) 564-1849
Fax: (202) 564-0019
Housman.van@epa.gov
russell.bethany@epa.gov

-and with respect to notices pertaining to technical matters to a contractor to be identified by EPA
in writing.

To LDEQ:

Celena J. Cage (or a successor identified by LDEQ in writing)
 Administrator
LDEQ Office of Environmental Compliance-Enforcement Division
Post Office Box 4312
Baton Rouge, LA 70821-4312
Phone: 225 219-3715
Fax: 225- 325-8142
celena.cage@la.gov

Lewis Donlon (or a successor identified by LDEQ in writing)
Administrator
LDEQ Waste Permits Division
P.O. Box 4313
Baton Rouge, LA 70821-4313
Phone: 225-219-3393
Fax: 225-219-3474
Dutch.donlon@la.gov

Kathy M. Wright and Perry Theriot (or successors identified by LDEQ in writing)
Office of the Secretary
Legal Affairs Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068
Kathy.wright@la.gov

**Mosaic Consent Decree – EPA Region 6 and LDEQ**

Perry.theriot@la.gov


To Mosaic and the Mosaic Company:

David Jellerson (or a successor identified by Mosaic in writing)
Senior Director of Environmental
Mosaic Fertilizer, LLC
13830 Circa Crossing Drive
Lithia, FL 33547

Patrick van der Voorn (or a successor identified by The Mosaic Company in writing)
The Mosaic Company
Senior Environmental Counsel
Atria Corporate Center, Suite E490
3033 Campus Drive
Plymouth, MN 55441

To Arnold & Porter LLP (Counsel for Mosaic):
Joel M. Gross
Lester Sotsky
Peggy Otum
Eric Rey(or successors identified by Mosaic in writing)
Arnold & Porter LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001-3743


96.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

97.    Notices submitted pursuant to this Section shall be deemed submitted upon electronic transmission, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVI.  EFFECTIVE DATE

98.    The Entry Date of this Consent Decree shall be the date of a Final Order by which this Consent Decree is entered by the Court or by which a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.  The Effective Date of this

Consent Decree shall be the later of the Entry Date of this Consent Decree or the Entry Date of

the Consent Decree resolving claims by the United States and the Florida Department of

Environmental Protection against Mosaic relating to Mosaic's facilities in Florida.  The filing or

pendency of an appeal of the Court's entry of this Consent Decree shall not stay the Effective

Date, except as may be otherwise determined pursuant to Paragraph 100 (Modification).  In the

event that either Consent Decree is not entered by the Court, the Parties shall jointly stipulate to

stay any previously entered Consent Decree.  Notwithstanding the foregoing, Mosaic hereby

agrees that it shall be bound from the date of its execution of this Consent Decree to perform

obligations scheduled in this Consent Decree to occur prior to the Effective Date.

## XVII.  RETENTION OF JURISDICTION

99.     The Court shall retain jurisdiction over this case until termination of this Consent

Decree for both Facilities, pursuant to Section XIX (Termination), for the purpose of resolving

disputes arising under this Consent Decree (including disputes under any Trust Agreements

entered pursuant hereto) or entering orders modifying this Consent Decree, pursuant to Sections

XI (Dispute Resolution) and XVIII (Modification), or effectuating or enforcing compliance with

the terms of this Consent Decree.

## XVIII.  MODIFICATION

100.     The terms of this Consent Decree may be modified only by a subsequent written

agreement of the Parties to this Consent Decree as set forth herein.  Any modifications to the

provisions of Appendices 1  through 7, hereto and any other modifications to any other

provisions of this Consent Decree that do not constitute a material change to this Consent Decree

may be made without approval by the Court upon written agreement between Mosaic and the

United States, after consultation with LDEQ.  Any modifications to the provisions of Appendix 8

may be made without approval by the Court upon written agreement between Mosaic and LDEQ, after consultation with the United States.  Any such changes shall become enforceable under this Consent Decree upon execution by Mosaic and the United States (for changes to the Consent Decree or Appendices 1 through 7) or Mosaic and LDEQ (for changes to Appendix 8), shall be made available to the public by EPA and LDEQ (except to the extent such changes contain information determined to be CBI pursuant to Paragraph 83 and 40 C.F.R. Part 2), and shall periodically be filed by EPA or LDEQ with the Court.  Any other modifications agreed to by the Parties shall be effective only upon approval by the Court.  Except as otherwise provided in this Paragraph and in Paragraph 102, a Party's refusal to agree to a modification of this Consent Decree shall be subject to dispute resolution, but a Party seeking judicial review of such a refusal shall bear the burden of demonstrating that it is entitled to the requested modification based on a significant change in factual conditions or the law or other reason that would make inequitable the continued application of the Consent Decree without the modification sought.

101.    In the event that a potential transferee under Section II (Applicability) of this Consent Decree has agreed to become a party to this Consent Decree and subject to all its terms and provisions, it may do so upon written approval of the United States pursuant to Section II (Applicability) of this Consent Decree and Section XVIII (Modification), without further order from the Court, in which event a supplemental signature page will be affixed to this Consent Decree and filed with the Court.

## XIX.  TERMINATION

102.    <u>Periodic Review of Work Status</u>.  At least once every three (3) years, and more often if the Parties so agree, the Parties shall meet to review the status of the Work and to evaluate whether discrete portions of the Work have either been completed or may be

accomplished and supervised under an EPA or LDEQ administrative order or permit in lieu of this Consent Decree.  If all Parties agree to such a modification, such agreement shall be memorialized in a written modification to this Consent Decree pursuant to Section XVIII (Modification) and shall not require judicial approval.  If the Parties agree that such modifications allow this Consent Decree to be terminated as to one or both Facilities, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree for the relevant Facilities.  The Parties' inability to reach an agreement under this Paragraph shall not be subject to dispute resolution or judicial review.

103.    Completion of Work.  Within ninety (90) Days after Mosaic concludes that all Work required under this Consent Decree has been fully performed at a Facility, EPA and/or LDEQ may conduct an inspection of the Facility to be attended by Mosaic, EPA and/or LDEQ at a mutually agreeable time.  Following the inspection, and correction of any problems or deficiencies noted by EPA, after consultation with LDEQ, Mosaic shall submit one or more written reports by a third-party registered professional engineer in the relevant technical field, certifying compliance with Section V (Compliance Requirements) of this Consent Decree that the Work has been completed in full satisfaction of the requirements of this Consent Decree. The reports shall indicate the case name and civil action number, and shall be submitted, together with a request for Acknowledgment of Completion, in accordance with Section VIII (Reporting Requirements) of this Consent Decree. Third-party engineer certification of any of the written reports may be waived at EPA's discretion, after consultation with LDEQ.

104.    If, after review of the written report(s) and certification and consultation with LDEQ, EPA determines that any portion of the Work has not been completed in accordance with this Consent Decree, EPA will notify Mosaic in writing of the activity(ies) and/or obligation(s)

that must be undertaken to complete the Work.  Without prejudice to the United States' right to enforce this Consent Decree or assess penalties for Defendant's failure to complete any portion of the Work in accordance with this Consent Decree, EPA will set forth in the notice a schedule for performance of the activity(ies) and/or obligation(s) required under the Consent Decree, or will require Mosaic to submit a schedule for EPA approval pursuant to Section V (Compliance Requirements) of this Consent Decree.  Mosaic shall perform all activities described in the notice in accordance with the specifications and schedules established therein, subject to Mosaic's right to invoke the dispute resolution procedures set forth in Section XI (Dispute Resolution) of this Consent Decree.

105.    If EPA concludes, based on the initial or any subsequent request for an Acknowledgment of Completion by Mosaic, and after reasonable opportunity for review and comment by LDEQ, that the Work has been fully performed in accordance with this Consent Decree, EPA will so notify Mosaic in writing, which notice shall constitute the Acknowledgment of Completion.

106. Termination.  After Mosaic has completed the requirements set forth in Paragraphs 102 and 103 of this Section, has obtained an Acknowledgment of Completion, has complied with all other requirements of this Consent Decree, and has paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Mosaic may serve upon the United States and LDEQ a Request for Termination, stating that Mosaic has satisfied those requirements, together with all necessary supporting documentation.  A Request for Termination may address one or both of Mosaic's Facilities.

107. Following receipt by the United States and LDEQ of Mosaic's Request for Termination, the Parties shall confer informally concerning the Request and any disagreement

that the Parties may have as to whether Mosaic has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with LDEQ agrees that the Consent Decree may be terminated for one or both Facilities, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree as to the relevant Facilities.

108. If the United States, after consultation with LDEQ, does not agree that the Consent Decree may be terminated as to one or both Facilities, Mosaic may invoke Dispute Resolution under Section XI (Dispute Resolution) of this Consent Decree.  However, all time periods and deadlines established under Section XI (Dispute Resolution) shall be extended by sixty (60) Days, or more by the agreement of the Parties.

## XX.  PUBLIC PARTICIPATION

109.  This Consent Decree shall be lodged with the Court for a period of not less than forty-five (45) Days for public notice and comment in accordance with 28 C.F.R. § 50.7 and La. R.S. 30:2050.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Mosaic and The Mosaic Company consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States has notified Mosaic in writing that it no longer supports entry of the Consent Decree.  Further, the parties agree and acknowledge that final approval by LDEQ and entry of this Consent Decree is subject to the requirements of La. R.S. 30:2050.7, which provides for public notice of this Consent Decree in the newspapers of general circulation and the official journal of the parish in which the Facilities are located, an opportunity for public

comment, consideration of any comments, and concurrence by the State of Louisiana Attorney

General. Evidence of final approval of this Consent Decree by LDEQ shall be LDEQ's

execution of a Motion to Enter this Consent Decree. LDEQ reserves the right to withdraw or

withhold consent and will not join in the filing of a Motion to Enter this Consent Decree if the

state Attorney General raises objections or if comments regarding this Consent Decree disclose

facts or considerations which indicate that this Consent Decree is inappropriate, improper or

inadequate.

## XXI. SIGNATORIES/SERVICE

110. Each undersigned representative of Mosaic and The Mosaic Company, the

Assistant Attorney General for the Environment and Natural Resources Division of the

Department of Justice, or her designee, and the Secretary of the Louisiana Department of

Environmental Quality certifies that he or she is fully authorized to enter into the terms and

conditions of this Consent Decree and to execute and legally bind the Party he or she represents

to this document. The undersigned Attorney General of Louisiana is authorized to and as

evidenced either by his signature below or his concurrence letter communicated to LDEQ

concurs in the entry of this Consent Decree.

111. This Consent Decree may be signed in counterparts, and its validity shall not be

challenged on that basis. Mosaic and The Mosaic Company agree to accept service of process

by mail with respect to all matters arising under or relating to this Consent Decree and to waive

the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure

and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXII. INTEGRATION

112.    This Consent Decree and its Appendices constitute the final, complete, and
exclusive agreement and understanding among the Parties with respect to the settlement
embodied in the Consent Decree and supersedes all prior agreements and understandings,
whether oral or written, concerning the settlement embodied herein.  Other than the Appendices,
which are attached to and incorporated in this Consent Decree, and the Referenced Documents,
no other document, nor any representation, inducement, agreement, understanding, or promise,
constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in
construing the terms of this Consent Decree.  The "Referenced Documents" are the following
documents which are referenced in the Consent Decree:  (1) Mosaic's consolidated waste
management practices submittal dated September 8, 2015 (Paragraph 15(b) and 16(b));
(2) LDEQ's September 29, 2015 letter to Mosaic (Paragraph 86); (3) Faustina Project 9
(Inspections, Maintenance and Repair of Ditches Flowing in the Granulation Sump)
demonstrations dated September 23, 2015 and January 13, 2016 and approved by LDEQ on
March 7, 2016 (Appendix 6, Faustina Project 9); and (4) Overview of Seepage Control Features
and Projected Groundwater Quality Impacts for Mosaic Fertilizer, LLC Uncle Sam
Phosphogypsum Stack System, dated January 6, 2011 and November 7, 2011 (Appendix 7).

## XXIII. FINAL JUDGMENT

113.    Upon approval and entry of this Consent Decree by the Court, this Consent
Decree shall constitute a final judgment of the Court as to the United States, LDEQ, Mosaic and
The Mosaic Company.  The Court finds that there is no just reason for delay and therefore enters
this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

# XXIV. APPENDICES

114.    The following Appendices are attached to and part of this Consent Decree:

Appendix 1 contains the following compliance requirements:

Attachment A (Site Assessment, Reporting, and Corrective Action);

Attachment B (Groundwater Requirements);

Attachment C (Phosphogypsum Stack System Construction and Operational Requirements);

Attachment D (Closure of Phosphogypsum Stacks/Stack Systems);

Attachment E (Critical Conditions and Temporary Measures);

Attachment F (Definitions for Purpose of the Consent Decree);

Attachment G (Phosphogypsum Stack System Closure Application);

Appendix 2 establishes Financial Assurance Requirements;

Attachment A (CFO Certification);

Attachment B (Phosphogypsum Stack System Closure and Long Term Care Cost Estimate);

Attachment C (Summary Costs for Phosphogypsum Stack System Closure and Long Term Care);

Attachment D (Financial Mechanisms: Trust Agreement Form, Trust Agreement Addendum Form, Corporate Guarantee form, Corporate Financial Test form; Letter of Credit form);

Attachment E (Type B Financial Metrics Chart);

Attachment F (Current Configuration of Operating Facilities' Phosphogypsum Stack Systems and Planned Expansions);

Attachment G (Summary of Phosphogypsum Stack System Volumes and Closure Areas);

**Mosaic Consent Decree – EPA Region 6 and LDEQ**

Attachment H (Guarantor's Representation and Certification);

Attachment I (Executed Corporate Guarantee for Phosphogypsum Stack System Closure

and Long Term Care Guarantee);

Appendix 3 is the collected Site Maps of the Mosaic Facilities;

Appendix 4 is the Uncle Sam and Faustina Facility Reports;

Appendix 5 is the Mosaic's current BMP Plan;

Appendix 6 is the RCRA Project Narrative and Compliance Schedule;

Appendix 7 is Mosaic's Phosphogypsum Stack System Alternative Liner Compliance

Requirements, Exemptions and Conditions for the Uncle Sam Facility; and

Appendix 8 is Underground Injection Control (UIC) Permitted Well at Uncle Sam.


Dated and entered this __6th__ day of ____July____, 2016.


_____

CARL J. BARBIER

UNITED STATES DISTRICT JUDGE

FOR THE UNITED STATES OF AMERICA:

Date: 9/29/15

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20530

Date: 9/30/15

DEBORAH M. REYHER
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044
(202) 514-4113

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Mosaic Fertilizer, LLC</u>, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:

Date: Sept 29, 2015

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Mosaic Fertilizer, LLC</u>, subject to the public notice requirements of 28 C.F.R. § 50.7.

FOR THE UNITED STATES OF AMERICA:

Date: 9/30/2015

RON CURRY
Regional Administrator
U.S. Environmental Protection Agency,
Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX 75202-2733

Date: 9/29/2015

MARCIA MONCRIEFFE
Assistant Regional Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency,
Region 6
1445 Ross Avenue, Suite 1200
Dallas, TX 75202-2733

·WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Mosaic</u> <u>Fertilizer, LLC</u> (E.D. La.), a civil action, subject to the public notice and comment requirements of LA. R.S. 30:2050.7.

FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY:

Date: __9-29-15__

D. CHANCE MCNEELY
Assistant Secretary
Office of Environmental Compliance
Louisiana Dept. of Environmental Quality

Date: __9-29-2015__

KATHY M. WRIGHT (LA Bar Roll #30804)
ELLIOTT VEGA (LA Bar Roll # 21397)
PERRY THERIOT (LA Bar Roll #19181)
Office of the Secretary
Legal Affairs Division
Louisiana Dept. of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Phone: (225) 219-3985
Fax: (225) 219-4068



Jeff Landry
Attorney General

**State of Louisiana**
DEPARTMENT OF JUSTICE
CIVIL DIVISION
P.O. BOX 94005
BATON ROUGE
70804-9005



RECEIVED
JUN 1 0 2016
LA. DEPT. OF ENV. QUALITY
LEGAL DIVISION

June 8, 2016

Herman Robinson, General Counsel
La. Department of Environmental Quality
Legal Division
P.O. Box 4302
Baton Rouge, LA  70821-4302

David Jellerson
Senior Director of Environmental
Mosiac Fertilizer, LLC
13830 Circa Crossing Drive
Lithia, FL 33547

       Re:    AG Review of Consent Decree;
             *United States of America and Louisiana Department of Environmental Quality v.*
             *Mosaic Fertilizer, LLC,* Civil Action No. 2:15-cv-04889-CJB-KWR, USDC,
             Eastern District of La.

Dear Mr. Robinson and Mr. Jellerson:

Louisiana Revised Statute 30:2050.7 authorizes the Louisiana Department of Environmental Quality, with the concurrence of the Attorney General, to settle claims for penalties under the Louisiana Environmental Quality Act or the regulations or permit terms and conditions applicable thereto.  Specifically, La. R.S. 30:2050.7(E)(2)(a) provides, "[s]ettlements provided for under this Section shall be submitted to the attorney general for his approval or rejection…[a]pproval or rejection by the attorney general shall be in writing with a detailed written reason for rejection."

The consent decree and the underlying enforcement action, has been submitted to me for approval or rejection as required by law.  Pursuant to the authority granted to me by Art. IV, Sec. 8 of the state constitution and R.S. 30:2050.7, I approve the above referenced consent decree.

         Sincerely,

         **JEFF LANDRY**
         **ATTORNEY GENERAL**

     By:                            
         Steven B. "Beaux" Jones
         Assistant Attorney General

Mosaic Consent Decree – EPA Region 6 and LDEQ

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Mosaic Fertilizer, LLC,</u> Civil Action No. _____, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

FOR MOSAIC FERTILIZER, LLC:

Date: _____

Mark Isaacson
Senior Vice President and Corporate Secretary
Mosaic Fertilizer, LLC

**Mosaic Consent Decree – EPA Region 6 and LDEQ**

FOR THE MOSAIC COMPANY (as to Sections I (Jurisdiction and Venue), II (Applicability), XI (Dispute Resolution), XIII (Effect of Settlement), XV (Notices), XVI (Effective Date), XVII (Retention of Jurisdiction), XVIII (Modification), XX (Public Participation), XXI (Signatories/Service), XXII (Integration), XXIII (Final Judgment), and Paragraphs 25 and 26 (Financial Assurance)):

Date: _____